# WASHINGTON GAS LIGHT COMPANY v. LANSDEN.

ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 43.　Argued October 17, 18, 1898. — Decided January 16, 1899.

In order to hold a corporation liable for the torts of any of its agents, the act in question must be performed in the course and within the scope of the agent's employment in the business of the principal.

A corporation can; however, also be held responsible for acts of its agent, not strictly within its corporate powers, which were assumed to be performed for it by an agent competent to employ the corporate powers actually exercised; but in such case, there must be evidence of some facts from which the authority of the agent to act upon or in relation to the subject-matter involved may be fairly and legitimately inferred by the court or jury, though this evidence need not necessarily be in writing.

When the only conclusion to be drawn from such evidence is a want of authority, the question is one for the court to decide without submitting it to the jury.

In this case the court should have directed a verdict for the corporation on the ground that there was an entire lack of evidence on which to base a verdict against it.

The judgment in this case against Mr. Bailey also should be reversed, as it is not supported by the evidence.

In an action in tort brought in the District of Columbia, the common law rule prevails that those defendants who are sued together and found guilty are liable for the whole injury to the plaintiff, without examining the question of the different degrees of culpability; and as evidence of the wealth of the corporation defendant was admitted in evidence against all the defendants as a ground for punitive damages, and as the individual defendants were joined by the voluntary act of the plaintiff, the court is of opinion that it was not admissible as against them.

Evidence of the wealth of one of the defendants in an action of tort is inadmissible as a foundation for computing or determining the amount of such damages against all.

In a case of this character, where the line between compensatory and punitive damages is vague, it is impossible to say that, by merely charging the jury that punitive damages cannot be recovered, the effect of incompetent evidence received as to the wealth of one of the defendants was thereby removed, or that the verdict of the jury can be held to have been based solely upon the competent evidence in the case.

Where a judgment is based upon a cause of action of such a nature that it might work injustice to one party defendant, if it were to remain intact as against him, while reversed for error as to the other defendants, the power exists in the court, founded upon such fact of possible injustice, to reverse the judgment in toto, and grant a new trial in regard to all the defendants.

THE case is stated in the opinion.

*Mr. R. Ross Perry* and *Mr. Walter D. Davidge* for plaintiffs in error.

*Mr. J. J. Darlington* for defendant in error. *Mr. J. Altheus Johnson* was on his brief.

MR. JUSTICE PECKHAM delivered the opinion of the court.

This action was brought by the defendant in error, plaintiff below, in the Supreme Court of the District of Columbia, against the Washington Gas Light Company; John R. McLean, its president; Charles B. Bailey, its secretary; William B. Orme, its assistant secretary; and John Leetch, its general manager. The action was brought to recover damages for an alleged libel which the plaintiff stated the defendants had published or caused to be published of and concerning him in a periodical printed in the city of New York called The Progressive Age. The plaintiff recovered a verdict of $12,500 against the corporation defendant, its secretary Bailey, and its general manager Leetch. There seems to have been no finding as to the other defendants.

Those defendants against whom the verdict was rendered brought the case by appeal to the Court of Appeals for the District, where the judgment was affirmed, and the defendants then brought the case here on writ of error.

It appears from the declaration that a committee of the House of Representatives, in January, 1893, having in charge the sundry civil appropriation bill, had therein provided that not more than seventy-five cents per thousand feet should be paid for gas used in the government buildings in the District of Columbia. The gas company desired to defeat this provision in the bill, and the president, Mr. McLean, sent for the plaintiff below, who was general manager of the company, for the purpose of inquiring what the plaintiff could testify to in regard to the price of gas if called before the committee. The president asked the plaintiff to furnish him with a writ-

ten memorandum showing generally what he could testify to and which he might use as a basis for questions to be put to him by some member of the committee. The plaintiff wrote out such a memorandum, but did not mention therein the cost of gas to the defendant company, and when the president noticed the omission he asked the plaintiff what the cost would be, and plaintiff stated that that was a matter which should come from the chief officers of the company, and which was unknown to him.

The plaintiff did not testify before the committee at that session of Congress.

Thereafter and in February, 1894, and when not requested by the president of the company or any of its officers or agents, the plaintiff did appear before a committee of Congress, and did testify to figures at which plaintiff supposed gas could be actually produced and furnished in the city of Washington.

The plaintiff then alleged that the defendants in the month of February, 1894, published or caused to be published in a newspaper or periodical called The Progressive Age, which was printed in the city of New York, and widely circulated as an organ devoted to the interests of gas producers and manufacturers throughout the country, the libel in question.

The article states in substance as follows: The plaintiff had once filled the position of general manager of the gas company, which he had resigned in June, 1893, and that in his testimony before the Congressional committee in 1894 the plaintiff had arrayed himself within the ranks of those who sought to tear down and lay waste the business and emoluments of his former employers. He gave testimony which was reported through the land and was of such a nature as was calculated to do the utmost harm to gas interests everywhere. The figures supplied by Mr. Lansden of the cost of gas were startling, and only a year ago (in 1893) a similar inquiry emanating from the same quarter was instituted before a Congressional committee against the Washington Gas Light Company, and plaintiff appeared as a witness in behalf of the company; that he then occupied the position

of general manager of the company, and his testimony then, as compared with that given subsequently, was sadly at variance; that he had there testified before the committee that it cost 48.38 cents per thousand to manufacture gas in the holder, and 40.09 cents per thousand for distribution, and that he knew of but one way that a small amount could be saved, and that was by reducing the salaries of the clerks and the price paid to the laborers, which the company would not like to do. In 1894, before a committee of Congress, the plaintiff testified that from his knowledge of the business and the condition of affairs at Washington, the gas company could sell gas and pay a reasonable profit at a dollar a thousand. He stated that in his opinion the gas could be manufactured and put in the holder for about thirty-two cents a thousand feet, and that it ought to be distributed for from twenty to twenty-two cents a thousand, which would make the whole cost from fifty-two to fifty-four cents per thousand. The article then continued:

"From the foregoing extracts of this witness' testimony only one of two conclusions can be arrived at, and we are too sensible of the reader's power of analysis and feel too keenly for the witness to heap coals of fire on the head of one who, it is only too evident, has allowed his sense of justice to be distorted by real or fancied grievances. The testimony given by Mr. Lansden in 1893 states in effect that there is no way open to his company by which it could reduce the cost of manufacturing gas. In 1894 he tells the committee that — taxes and repairs added, items not considered in the inquiry of the previous year — the cost of gas delivered to the consumer could be brought within seventy cents, or about eighteen and one half cents less per thousand than he quoted as the lowest manufacturing and distributing cost the year before; and yet Mr. Lansden must know that the generating apparatus at the Washington works is the same as when he filled the position as superintendent; that the cost of all materials used, coal and labor are just the same, save only naphtha, which is now higher in price than when he testified a year ago."

For publishing or causing to be published this article the plaintiff brought this action.

The defendants joined in their plea of not guilty, and the plaintiff joined issue thereon. After verdict a motion for a new trial was made and denied, and judgment entered upon the verdict.

The questions which present themselves in this record relate primarily to the liability of each of the plaintiffs in error, and those questions depend for their proper solution upon the evidence set forth in the record.

And first in regard to the liability of the corporation. From the evidence it appears that at the time of the publication of the libel John Leetch was the general manager of the gas company. After the plaintiff had been sworn before the Congressional committee, in February, 1894, one E. C. Brown, who was the publisher of the periodical called The Progressive Age, and who lived in the city of New York, wrote a letter, under date New York, February 12, 1894, addressed on the inside to the Washington Gas Light Company, Washington, D. C. That letter reads as follows:

"Gentlemen: I have watched with great interest the continued reports of the proceedings against your company, as published in the local newspapers of your city, and I have been somewhat surprised at the character and extent of Mr. Lansden's testimony. Were his statements correctly reported in the Washington Star of 3d inst.? Newspapers all over the country are taking up his figures and using them to suit their own ends against home companies. Any information you would care to give us concerning the object of Mr. Lansden's attack will be considered confidential as to source of information.

"Very truly yours,

"E. C. BROWN."

The envelope enclosing this letter was addressed to "John Leetch, Manager Washington Gas Light Co."

In reply to that letter, Mr. Leetch wrote the following:

"Washington, D. C., *Feb.* 13, 1894.
"E. C. Brown, Esq, Publisher Progressive Age,
"280 Broadway, N. Y.

"Dear Sir: I have just now received yours of the 12th instant, relative to the statement made by Mr. T. G. Lansden, former sup't of the Washington Gas Light Company, before the investigating committee of Congress to reduce the price of gas in this city.

"As Mr. Lansden is no longer in the employ of the gas company, the motive was generally understood that prompted his statement.

"As the newspapers in Washington gave a correct version of his statement, there is no doubt he said that gas could be furnished at the meter for seventy cents and to the consumer for $1.00 per 1000 cubic feet. This price at the meter was exclusive of repairs, services, etc.

"Under a former resolution of Congress, bearing date of February, 1893, Mr Lansden was called upon to answer certain questions bearing upon the reduction of price of gas in Washington, and made the following replies:

"'Q. What does gas cost to manufacture at your works?

"'A. It costs us 48.38 c. per thousand in the holder and 40.09 c. per thousand for distribution.

"'Q. Can you in any way reduce the cost of gas in the manufacturing so your company could sell for less to the consumer?

"'A. I know of but one way that a small amount could be saved — that is, by reducing the salaries of our clerks and the price paid to our laborers. This we would not like to do.

"'Q. How do the prices charged for lamps in Washington compare with other cities?

"'A. They are as low as any where the same amount of gas is burned to the lamp and the same number of hours lighted in the year, and when the company lights and cleans the lamps.'

"You will notice that he makes a difference of about 18½ cents per 1000 feet then as compared with his statement now,

although he must know that the material used, coal and labor, is just the same now as then, except price of naphtha, which is higher. You can try to reconcile the two statements.

"Very truly, yours,

"John Leetch,

"*General Manager*."

There is no evidence that any other officer of the company or any member of its board of directors advised or requested Mr. Leetch to send this letter or was cognizant of his intention in that regard. Mr. Leetch swore that the letter was written by him unaided, and that the letter from Brown was a personal letter, and he answered it as such.

After Leetch received the letter, and before he answered it, he had a conversation with Mr. Bailey, the secretary, in which he informed the secretary that he had received such a letter, and he then showed it to Bailey, who read it and returned it to Leetch. Bailey then said to Leetch that he (Bailey) had a paper in plaintiff's handwriting, where he stated "that the price of gas was so and so, and that the price of distribution was so and so," and he then gave Leetch the paper. Bailey said he did not know what Leetch wanted with it, and he thought nothing more about it; that Leetch took the paper and went off to his room, and Bailey never saw it again or heard of it until after Leetch's letter was written and sent. Bailey swore he knew nothing about Leetch's letter in answer to Brown until after it was sent, and that he gave no data to Leetch to reply to the letter, but simply told Leetch as matter of fact the plaintiff had said that gas could be made and sold at a profit at a dollar a thousand.

On the 14th of February, 1894, Mr. Brown wrote another letter, addressed to John Leetch, general manager, Washington Gas Light Company, Washington, D. C., in which he asked for more details in regard to the testimony of plaintiff before the committee of Congress. Receiving no reply, Mr. Brown, under date of February 19, again wrote Leetch, asking for the details as mentioned in his preceding letter of the 14th. This letter was answered as follows:

"E. C. Brown, Esq., Publisher Progressive Age,

"280 Broadway, N. Y.

"Dear Sir: I am in receipt of yours of the 14th and 19th instant. This delay in reply was my inability to secure a copy of report of proceedings before investigating committee of Congress. Only about twenty copies have thus far been printed for use of committee.

"To-day I received a copy, which I herewith enclose for your use.

"Respectfully,

"John Leetch,

"*General Manager.*"

There is no evidence showing that this letter was either written by authority of any officer or director of the company, or that any such officer or director had any knowledge in regard to it.

It appeared in evidence that some time after Leetch answered the letters he placed them among papers of the company in the secretary's office, and they were so placed, because, as Mr. Leetch testified, it was a matter that had then assumed a position when it was necessary to save the letters, and he therefore placed them in the care and custody of the secretary.

Mr. Leetch further testified that none of the letters written by him were written in his capacity as general manager of the company; that they were written by him as a mere personal matter, altogether exclusive of any duty that he owed the gas company; that the gas company had no interest in the matter, and that he merely wrote them as an act of courtesy, stating the facts.

It also appeared that all the letters written by Mr. Leetch to Mr. Brown were copied by Leetch into the letter book of the company kept in the secretary's office, all the letters in which book were written either by the secretary, the assistant secretary or the general manager. Mr. Leetch did not know of any letters of personal or individual matters in that book prior to March 1, 1894, or that did not relate to the affairs of

the gas company, except those of the same nature as those letters above referred to.

The testimony also showed that Mr. Leetch, at the time he was made manager, was appointed generally to take care of the works and to do the best he could for the company; that he was a gas engineer, and took care of the works and took the place of what used to be the engineer, and after his appointment they had two engineers, one at each end, who were subordinate to Mr. Leetch.

As bearing upon the duties of Mr. Leetch, the record also contains evidence in the shape of a letter signed by the president by the authority of the board of directors of the gas company, dated Washington, March 1, 1865, and addressed to Mr. George A. McIlhenny, by which the latter was appointed superintendent of the gas works, and his duties were therein stated to be to take charge of every portion of said works pertaining to the manufacture, distribution and consumption of gas, and all persons employed in those departments; contracts for purchasing coal and selling tar were to be made by the president, but the superintendent was authorized to contract for other supplies to the works, the contracts to be submitted to the president for approval. The superintendent was to fix the price of coke, but all coke was to be purchased and paid for at the office. The superintendent was to have stated hours for being at the office in town and give attention to all complaints of leaky mains, etc. His special attention was directed to certain points regarding the standard for gas and increasing its product per pound of coal; increasing the coke sold; saving of refuse coke; reduction of men employed at the works; number of thousand feet of gas produced, and all other points which need correction; the letter closing with the statement: "The welfare of the company demands economy in its management, and that the gas produced shall be uniformly good." From that time until the year 1886 there is no evidence regarding the duties of superintendent or manager of the company.

In September, 1886, at a meeting of the board of directors, the president called the attention of the board to the necessity

of employing a competent man to fill the position of superintendent of the company, (said position being formerly designated engineer,) and Mr. McIlhenny (the president) was authorized to employ such person for the position. Pursuant to that authority the president wrote to Mr. Lansden (the plaintiff) stating: " Our board of directors has authorized me to employ a superintendent, and I have concluded to offer you the position at a salary of $5000 per annum, payable monthly, the condition being that you will give satisfaction, presuming that you are a first class gas works superintendent, otherwise this agreement may be revoked at any time." The plaintiff was at this time a gas engineer, who is, as plaintiff testified, a man who constructs and manufactures gas works and manufactures gas. His duties as superintendent would not enable him precisely to know the cost of the manufacture and distribution of gas.

Mr. McLean, president of the company, testified on this trial in regard to the position of Mr. Leetch; that he first had a recognized position with the company after Mr. Lansden (plaintiff) had left the service of the company; that he thought Leetch was on the pay roll of the company at that time; he was just generally employed there and familiarized himself with the company, but had no positive employment until after Mr. Lansden, the plaintiff, left; that Mr. Leetch was not put in exactly the position Mr. Lansden had occupied, but that in fact he was appointed generally " to take care of the works and to do the best he could do for the company; that he was a gas engineer and took care of the works."

This is all the evidence contained in the record bearing upon the duties of Mr. Leetch as general manager of the company and of his right to act for it in the above matter.

The question arises whether upon these facts and the legitimate inferences which may flow from them, the corporation defendant can be held liable for the publication of the libellous article in The Progressive Age.

That a corporation may be held responsible in an action for the publication of a libel is no longer open for discussion in this court. *Philadelphia, Wilmington & Baltimore Railroad*

v. *Quigley*, 21 How. 202, 210. In that case the company was held liable in damages to the plaintiff, Quigley, for the publication of a libel regarding the plaintiff's skill and capacity as a mechanic. Quigley brought his action against the company because the company published a letter addressed to it in the course of an investigation by its board of directors in regard to the conduct of some of its subordinates. The letter contained libellous matter in regard to the plaintiff, and with much other testimony was printed and published by the board of directors, and the court decided that the corporation could be held liable for the publication. In that case Mr. Justice Campbell, in delivering the opinion of the court, said : "That for acts done by the agents of a corporation, either *in contractu* or *in delicto*, in the course of its business and of their employment, the corporation is responsible as an individual is responsible under similar circumstances." The doctrine of this case has been approved and reaffirmed in many cases in this court since that time.

The result of the authorities is, as we think, that in order to hold a corporation liable for the torts of any of its agents, the act in question must be performed in the course and within the scope of the agent's employment in the business of the principal. The corporation can be held responsible for acts which are not strictly within the corporate powers, but which were assumed to be performed for the corporation and by the corporate agents who were competent to employ the corporate powers actually exercised. There need be no written authority under seal nor vote of the corporation constituting the agency or authorizing the act. But in the absence of evidence of this nature there must be evidence of some facts from which the authority of the agent to act upon or in relation to the subject-matter involved may be fairly and legitimately inferred by the court or jury. *Salt Lake City* v. *Hollister*, 118 U. S. 256, 260 ; *Denver & Rio Grande Railway* v. *Harris*, 122 U. S. 597, 609 ; *Lake Shore & Michigan Southern Railway* v. *Prentice*, 147 U. S. 101, 109, and cases cited at p. 110.

In this case no specific authority was pretended to have

been given the general manager, Leetch, to write the letters which he sent to Brown, or to authorize the publication of anything whatever in the periodical named. We are then limited to an inquiry whether the evidence is sufficient upon which a jury might be permitted to base an inference that Leetch had the necessary authority to act for the company in this business. If different inferences might fairly be drawn from the evidence by reasonable men, then the jury should be permitted to choose for themselves. But if only one inference could be drawn from the evidence, and that is a want of authority, then the question is a legal one for the court to decide. We do not mean that in order to render the company liable there must be some evidence of authority, express or implied, given to the manager to publish or to authorize the publishing of a libel, but there must be some evidence from which an authority might be implied on the part of the manager to represent the company as within the general scope of his employment, in regard to the subject-matter of the correspondence between Brown and himself. There is no evidence of an express authority, nor of any subsequent ratification of Leetch's conduct by the company. Can any authority be inferred from the evidence as to the nature of the duties and powers of the manager? Were the acts of Leetch within the general scope of his employment as manager? Upon a careful perusal of the whole evidence we find nothing upon which such an inference can be based; nothing to show that any correspondence whatever, upon the subject in hand, was within the scope of the manager's employment. Commencing with the time when a superintendent was employed in March, 1865, down to the employment of Leetch, no such power could be inferred from the evidence regarding the duties of a superintendent or manager. In March, 1865, the duties of such an officer were plainly stated. They were : " To take charge of every portion of said works pertaining to the manufacture, distribution and consumption of gas and all persons employed in those departments." Further details of his duties were mentioned in the writing making the appointment, but they all related to the carrying on of the business of the company. From all

that appears in the record the duties of superintendent of the gas works remained as stated in the communication as above mentioned, with possibly a change in the name from superintendent to engineer, until 1886, when, under authority of the board of directors, Mr. Lansden, the plaintiff, was employed as superintendent upon the presumption, as stated, that he was a first class gas works superintendent. There is nothing from which we could infer that the character or scope of the duties of superintendent was enlarged or changed at the time the plaintiff accepted the position from what those duties were stated to be in the letter appointing a superintendent in 1865.

From the evidence in the case, no presumption could be indulged that the duties of the general manager of the corporation in question included in their general scope or character the right to represent the corporation in any business such as is referred to in the letters of Brown or in the letters of Leetch in answer thereto. The letters of Mr. Brown had nothing whatever to do with the transaction of the business of the corporation or with anything relating thereto which the superintendent was authorized to perform. It was an inquiry relative to a past transaction regarding the testimony supposed to have been given before a committee of Congress, having, among other things, the subject of the price of gas in the city of Washington before it for consideration. From the evidence in this case, it is plain that it was no part of the duty of the general manager even to appear before that committee unless summoned so to do by the committee, or specially directed by the company to so appear. In no view of the evidence can we see 'the least basis for an inference that the manager had authority to represent the company in any matter connected with third parties and relating to the character of the evidence given by the plaintiff before the committee of Congress.

The manager did not himself regard the correspondence as one of an official nature, and he swears that he answered the letters as a mere personal matter, altogether exclusive of any duty that he owed to the gas company; that the gas

company had no interest in it, and he merely wrote the letters as an act of courtesy stating the facts, and that none of the officers of the company were informed as to the contents of the letters that he wrote, and they were ignorant regarding them.

The plaintiff, of course, would not be bound by the evidence of Mr. Leetch as to how he regarded the letters or in what capacity he thought that he was answering them, if there were other evidence in the case from which a contrary inference could properly be drawn — evidence from which it could be inferred that the manager was acting within the scope of his employment as manager; in such case it would be proper to refer the question of fact to the jury to ascertain whether the letters were written within the scope of his employment, notwithstanding his assertion that he wrote them in his personal capacity.    But there is no such evidence.

The fact that the manager copied his letters to Brown into the official copy book kept in the office of the secretary is not material upon this question.    It was the act of Mr. Leetch, unknown to the officers of the company, so far as the record shows, and the company cannot be held liable for the original act of Leetch by such evidence.    It does not tend to show that his action was within the scope of his employment as manager.

If we set aside for a moment the testimony in regard to the duties to be performed by the superintendent, as stated in the communication of March, 1865, and look simply at the other facts in the case, we are still without any evidence from which it might be inferred that the act on the part of the manager was within the scope of his employment.    The burden is upon the plaintiff to show this fact.

From the use of the term "general manager" we should not be authorized to infer any such authority, nor would it be permissible to allow the jury to make a mere guess that it existed.    A general manager of a business corporation, such as this gas company is, would not be presumed to have this power.    The term, in our judgment, when used in connection with such a corporation cannot, in the absence of any

evidence on the subject, be presumed to mean anything more than that the person filling the position has general charge of those business matters for the carrying on of which the company was incorporated. These might include the buying of material, the employment of laborers, the supervision of their labor, the manufacture of gas, its distribution and the general ways and means of accomplishing the object of the corporation — all these in subordination to the board of directors and such superior officers as the board should provide.

We are of opinion that the court erred in submitting to the jury the question whether Leetch, in respect to the subject of the letters written by him to Brown, had authority to bind the company. The court should have directed a verdict for the corporation on the ground that there was an entire lack of evidence upon which to base a verdict against it.

The next question arises in regard to the defendant Bailey.

The only evidence in regard to this defendant is that he was secretary of the company at the time in question; that after Mr. Lansden, the plaintiff, had made the memorandum in preparation for his being called as a witness before the Congressional committee in 1893, and in which memorandum he had stated the cost of gas, (although, as he says, he took that cost from the president, and did not pretend to state it as of his own knowledge,) he gave the memorandum to Mr. McLean, the president of the defendant company, who gave it to Mr. Bailey, the secretary, who had kept it in his possession from that time; that after Mr. Leetch received Mr. Brown's first letter relating to the plaintiff's testimony before the Congressional committee of 1894, Mr. Leetch showed him (Bailey) the letter, and that Mr. Bailey then read it, and stated : "I have a paper in Mr. Lansden's own handwriting, where he stated that the price of gas was so and so and the price of distribution was so and so;" and he then gave Leetch the paper; that he then knew that the items therein, so far as they regarded the cost of distribution, did not rest on plaintiff's personal knowledge, but that they came from the books; that he did not know what Leetch wanted with the paper; that he thought nothing about it; that Leetch had asked him

" Where is the paper ? " and he then got it, and Leetch asked him to let him take it; and that Leetch did take it and went off to his room, and that Bailey never saw it again or heard of it until after the letter was written; that Bailey did not give Leetch any data to reply to the letter and he thought nothing about writing the letter, and that he simply said, as a matter of fact, that he (Lansden) had said that gas could be made and sold at a profit at a dollar.   He never knew that the first letter of Brown had been answered until he saw it in The Progressive Age.

This is all the evidence connecting Mr. Bailey in any way with the publication of the libel, and we think it wholly insufficient for that purpose.   We think there is nothing in this evidence from which the inference can reasonably and fairly be drawn that there was any intention on the part of Mr. Bailey to furnish Mr. Leetch with the figures in the memorandum so that he might answer the letter from Mr. Brown, and have the figures or any other matter published in his paper.

A finding by the jury, that Mr. Bailey furnished the information contained in this memorandum to Mr. Leetch for the purpose of having him communicate it to Mr. Brown, and for the purpose of having Mr. Brown publish the same, would not be supported by any evidence in this case.   Such a finding would be a pure guess, unsupported by any evidence, and the jury should not be offered the opportunity to make it.   The judgment should, therefore, be reversed as against Mr. Bailey.

The third question relates to the judgment against Leetch.

We are of opinion that the judgment ought also to be reversed and a new trial awarded as against him.   We do not think it would constitute a defence in his case that there were other matters contained in the article published by Mr. Brown, not pertaining to and which were no part of the subject-matter upon which Mr. Leetch wrote his letters.   For anything appearing in that publication which was outside and beyond the scope of the subject-matter of the letters of Mr. Leetch, he would not be responsible, because he could not be charged with authorizing the publication of such matter in any form, but if upon all the evidence on another trial the jury should be satis-

fied he furnished the publisher, Mr. Brown, with information of a libellous character regarding the plaintiff, for the purpose and with the intention of having the same published by Mr. Brown, we think that the defendant might be held liable for such publication on the ground that it was published by his aid and procurement and substantially by his agent. Of course, the evidence would have to be sufficient to justify a jury in finding the fact of such intention, and that the information was so furnished to Mr. Brown.

There are, however, two grounds upon which we think this judgment should be reversed, and no judgment entered upon the verdict even as against Mr. Leetch, one of which rests upon an exception to evidence, and the other is based upon the substantial injustice which we think might be the result if we were to permit judgment to be entered upon the verdict as against him alone.

When the plaintiff was on the stand, upon direct examination, he testified that the total capital stock of the company defendant was $2,000,000. He was then asked as to the dividends that had been paid upon the stock within his knowledge. This was objected to by counsel for defendants, who said it was perfectly well known that the gas company was able to pay the amount claimed in this libel case, and what dividends they pay is a matter private to the company.

Counsel for plaintiff said he was seeking to show only its earning capacity. To which counsel for defendants said they would admit that the company was able to pay this amount claimed. "The Court: Still they have the right to show the volume of the property of the company, and any evidence tending to show the volume of the property would be competent." To which ruling of the court counsel for the defendants excepted.

The witness then testified that the company had paid the last two regular dividends of ten per cent upon its capital stock.

The court then said to counsel: "That the admission of the fact that the company was able to respond in damages amounted to nothing; that the object of the evidence was

to furnish the jury a basis upon which they might calculate exemplary damages if they were entitled to exemplary damages, as was claimed. If the jury were going to give exemplary damages they might give much larger damages against a very wealthy person than they would against a person of ordinary circumstances." Counsel for the defendants said that their claim was only $50,000. To which the court responded : " If you admit that if they are entitled to a verdict at all they are entitled to $50,000, that does away with the necessity of the evidence ; otherwise I think it would be admissible." And under the objection and exception of the defendants' counsel the witness then testified that he knew what dividends had been paid by the gas company since 1890, but did not know what had been earned ; that every year they had paid 10 per cent ; that in 1893, they had paid 15 per cent ; that was an extra dividend ; that in 1895 they had paid $400,000 — an extra dividend ; that from 1890 down to the present time they had paid the regular 10 per cent dividend every year, and that in 1890 they had issued $600,000 of interest-bearing certificates to the stockholders, which would make it 40 per cent for that year, and in 1893 there was a special dividend paid of $3 per share in addition to the 10 per cent ; that in 1894 he did not know of anything being paid but the regular dividend ; that in 1895 they paid $4 a share, and that it takes $200,000 to make the regular dividend, and they paid $400,000 extra in, $600,000 altogether. · The court did not directly instruct the jury that the evidence was only admissible for the purpose stated by him in his reply to the objection made by counsel for the defence. In his final charge to the jury and upon the request of the counsel for the defendants, the court instructed the jury that the plaintiff was not entitled to recover punitive damages against the defendant company or against either of the other defendants, but only such damages as the evidence proves that he has sustained on account of the action of the defendants, if any.

The plaintiff in bringing his action saw fit to join the gas company and several of its officers as individual defendants. He could, had he so chosen, have brought his action against

the company alone. All the defendants joined in a plea of not guilty, and the jury could not find a verdict of guilty against all, and apportion the damages among the several defendants by giving a certain amount as against the company and a certain other amount as against the individual defendants. Those of the wrongdoers who are sued together and found guilty in an action of tort are liable for the whole injury to plaintiff, without examining the question of the different degrees of culpability. And if but one is sued, he is liable for all the damages inflicted by the most culpable. Cooley on Torts, 133, 135, 136; *Currier* v. *Swan*, 63 Maine, 323; *Berry* v. *Fletcher*, 1 Dill. 67; *Pardridge* v. *Brady*, 7 Ill. App. 639; *McCarthy* v. *De Armit*, 99 Penn. St. 63, 72.

The rule is different in South Carolina, where the jury can apportion the damages among the different defendants found guilty. It is acknowledged to be a departure from the rule at common law. *White* v. *McNeily and others*, 1 Bay, 10, 11.

As between themselves, there is no contribution among several tort feasors. *Merryweather* v. *Nixan*, 8 T. R. 186; *Farebrother* v. *Ansley*, 1 Camp. 343; *Wilson* v. *Milner*, 2 Camp. 452; Cooley on Torts, pp. 148, 149. A verdict might therefore be rendered against all defendants and collected out of one, and he would have no right of contribution. And the verdict, enhanced by the evidence of the wealth of one defendant, might be collected from the defendant the least able to respond and the least culpable of all, who would thus be mulcted in punitive damages, the amount of which might have been measured by the evidence of the wealth of another defendant.

In this case the jury was bound to give one entire sum against all the defendants found guilty, and that sum would be included in the judgment against each of them. The object of the evidence in relation to the capital stock of the corporation and the dividends declared by it was, as stated by the court to counsel, for the purpose of furnishing the jury the basis upon which they might calculate exemplary damages, yet it is not plainly limited to that purpose by any direction given to the jury by the court. If the evidence would be ad-

missible for the purpose stated by the court to counsel, in a case against the corporation alone, can it be that it would be admissible also in a case like this, where individual defendants are joined by the voluntary act of the plaintiff? We are of opinion that the evidence in regard to them would be inadmissible. It would form no basis for any verdict against the individual defendants. While a defendant who is least to blame is still liable for all the damages suffered by plaintiff, he is not liable to respond in punitive damages, the amount of which may be based upon particular evidence of the wealth of some other defendant.

Punitive damages are damages beyond and above the amount which a plaintiff has really suffered, and they are awarded upon the theory that they are a punishment to the defendant, and not a mere matter of compensation for injuries sustained by plaintiff. While all defendants joined are liable for compensatory damages, there is no justice in allowing the recovery of punitive damages in an action against several defendants, based upon evidence of the wealth and ability to pay such damages on the part of one of the defendants only. As the verdict must be for one sum against all defendants who are guilty, it seems to be plain that when a plaintiff voluntarily joins several parties as defendants, he must be held to thereby waive any right to recover punitive damages against all, founded upon evidence of the ability of one of the several defendants to pay them. This rule does not prevent the recovery of punitive damages in all cases where several defendants are joined. What the true rule is in such case is not perhaps certain. 7 Ill. App. 639; 99 Penn. St. 63. But we have no doubt it prevents evidence regarding the wealth of one of the defendants as a foundation for computing or determining the amount of such damages against all.

In many cases against several defendants it frequently happens that evidence is competent and is admitted as against one of the defendants only, and the court, on its own motion or on the request of the other defendants, would charge the jury that such evidence could not be taken into consideration as against the defendants to whom it did not apply. But here such a

power cannot be exercised. The court cannot say to the jury that the evidence of the wealth of the corporation is only received in regard to it and as furnishing a basis for a computation of exemplary damages against it. If received at all it must be received against all the defendants, as but one verdict can be given against all who are found guilty, when in truth in regard to all of them but the corporation it is evidence which is absolutely incompetent. Yet if the evidence is received on the assumption that it is material in relation to the corporation, the other defendants are affected by it the same as the corporation, and a verdict may very probably be enlarged against them because of the evidence as to the ability of the corporation defendant to pay. The jury is thus permitted to take into consideration the wealth of one defendant upon the question of the amount of the verdict against all of them.

Objection to the evidence was taken by counsel, and we think under the circumstances was well taken, and the exception is good in behalf of the individual defendants who were necessarily affected by its introduction.

But it is said that this error, if any, was cured by the ruling of the court in response to the request of defendants' counsel that punitive damages should not be granted. We are not certain as to that. As we have said, the court gave no instruction to the jury that it could only consider the evidence in connection with the question of punitive damages. The remark of the court as to the object of the evidence was made to counsel, and the court did not in any instructions given plainly limit the jury to its consideration for that purpose alone. The evidence was never withdrawn by the court, nor was the jury directed to take no notice of it. If the court admitted the evidence for one purpose only, and yet did not afterwards in terms withdraw it from the consideration of the jury, it was of such a nature that it still might affect the jury, even though the basis for its admission originally had disappeared. It is true the defendants did not in so many words ask the court to withdraw the evidence from the jury. It was, however, duly objected to when received, and it was

error to receive it. Under such circumstances, in order to cure the error, the court, when deciding that punitive damages could not be recovered, should have plainly and in distinct language withdrawn this particular evidence from the jury. We cannot be certain that its effect was removed by this action of the court. In a case of this character, where the line between compensatory and punitive damages is quite vague, and compensatory damages may be based upon the injury to the feelings and good name of a plaintiff, and where the amount even of such compensatory damages rests so largely in the discretion of a jury, we think it is utterly impossible to say that by merely charging the jury that punitive damages cannot be recovered, the effect of the incompetent evidence as to the wealth of one of the defendants was thereby removed or that the verdict of the jury can be held to have been based solely upon the competent evidence in the case.

We are also of opinion that even upon the assumption that no error was committed upon the trial as against the defendant Leetch, which in itself would call for a reversal, yet the judgment should be wholly reversed and no judgment entered upon the verdict as to him, because the original verdict was against the three defendants, and it was given under such circumstances that we might well fear the amount was enlarged by the evidence as to the wealth of the corporation, and it is possible, if not probable, that if a verdict had been rendered against the individual defendant alone, it would have been for a materially less amount. At any rate, the jury has never been called upon to render a verdict against a sole defendant, and while it may be said that whether against one or against all the defendants, the plaintiff suffers the same damage and should be entitled to a verdict for the same sum, still the question arises whether a jury, in passing upon the several liability of the individual defendant, would give a verdict of the same amount as it would if both the other defendants remained. We cannot say it would, and as the jury has never rendered a verdict against Mr. Leetch individually and solely, and as the case is one where damages are so largely in the sole discretion of the jury, we think it unjust and improper to permit this

verdict to stand against Leetch alone while we set it aside as against the other defendants.

Where the judgment is based upon a cause of action of such a nature that it might work injustice to one party defendant, if it were to remain intact as against him, while reversed for error as to the other defendants, then we think the power exists in the court, founded upon such fact of possible injustice, to reverse the judgment *in toto* and grant a new trial in regard to all the defendants.

The question is discussed with much fullness in *Albright* v. *McTighe and others*, 49 Fed. Rep. 817, and the same conclusion is arrived at.

The provisions contained in the judgment in *Pennsylvania Railroad* v. *Jones*, 155 U. S. 333, at 354, indicate the opinion of this court that it was right to reverse the entire judgment in that case for error in regard to one of several defendants, but the court held that as the error did not affect the others, the plaintiff should have liberty to become non-suit as to the one defendant and to then have judgment upon his verdict against the others. In that case there was a failure to prove a cause of action against the one defendant while no such failure existed as to the others, and there were no special reasons for a total reversal, but on the contrary, justice seemed to require that plaintiff should have the liberty of entering judgment upon his verdict against the other companies.

In regard to the defendants, McLean, the president, and Orme, the assistant secretary, the judge charged the jury that there was no prayer granted or asked by plaintiff's counsel directed specially to informing the jury whether it might or might not find against those defendants; that he did not understand that the plaintiff's counsel earnestly insisted upon a verdict against them personally; and he could only say that the evidence tending to show that they were personally liable was slight, and he submitted the case to the jury with that expression, leaving it to their discretion to find for or against them as they might think best. There was no finding by the jury against those defendants, and no judgment was entered against them and they have not brought error. In reversing

the judgment we do not intend to reverse what may be considered a finding of the jury in their favor.

*For the reasons given, we reverse the judgment of the Court of Appeals of the District of Columbia, with directions to that court to reverse the judgment of the Supreme Court of the District of Columbia and to grant a new trial to the three defendants who are plaintiffs in the writ of error sued out from this court.*