CUNNINGHAM et al. v. UNDERWOOD.

(Circuit Court of Appeals, Sixth Circuit. June 3, 1902.)

No. 1,027.

1. LIBEL—JOINT DEFENDANTS — MALICE OF ONE — INSTRUCTIONS—SEPARATE VERDICTS.

Where an action is brought against two persons for libel, an instruction that, if both are found guilty, the verdict should be against both jointly for such amount as would compensate the plaintiff for the entire injury done him, but if one was found to have been actuated by malice, while the other was not, the jury might also assess against that defendant, by way of smart money, such sum as they saw fit, not exceeding in all the amount sued for, is error, since in an action in tort against joint defendants one cannot be held liable to a greater extent than the others.

2. SAME—EXCEPTIONS—MOTION IN ARREST—REMITTITUR—APPEAL—REVERSAL.

Where, in an action for libel against two defendants, under an erroneous instruction of the court verdicts were rendered for compensatory damages against both and for punitive damages against one, and judgments entered thereon, without exception to such charge or motion in arrest of judgment, and the separate judgment was remitted before the hearing in the appellate court, the joint judgment should not be reversed because of such error.

3. SAME—PLEADING—JUSTIFICATION—INNUENDO—PROOF.

Where, in an action for libel, the plaintiff has, by innuendo, assigned a specific meaning to certain precedent words, of which they were ca-

pable, and defendant, in his plea, admits the publication, and avers generally the truth of the statements therein, to sustain such plea he must prove the truth of the libel with the meaning averred in the declaration.

**4. SAME—JUSTIFICATION—EVIDENCE.**
    Where, in an action for libel, plaintiff, by innuendoes, stated the meaning of the libel to be that he was not worthy to be retained in an office of trust in a voluntary association, which he then held, because he had theretofore been guilty of immoral, dishonorable, and disreputable acts and conduct, and defendant, in his plea, averred the truth of such statements, the exclusion of testimony, offered by defendant, of dishonorable acts of plaintiff as an officer of another association, for which he was deposed, was error.

**5. SAME—GENERAL REPUTATION—WITNESS—COMPETENCY.**
    A witness called to testify as to the general reputation for morality of the plaintiff in an action for libel cannot be required to show that he has talked with a majority, or any large number, of the people of the community, in order to qualify him to testify.

**6. SAME—REPUTATION OF PLAINTIFF—MITIGATION OF DAMAGES.**
    In an action for libel, where the character of plaintiff is put in issue by the general issue, evidence that his reputation is tarnished is competent in mitigation of damages.

**7. SAME—CHARGE—EXCEPTIONS.**
    Where, in an action for libel, the court charged that several parts of the publication were libelous per se, and some of the parts so pointed out were confessedly so, an exception "to the portions of the charge wherein it is stated that certain parts of the publication are libelous per se" is too broad, and therefore bad.

**8. SAME—MOTIVE—PRIVILEGE.**
    Plaintiff, an officer in a voluntary association, brought an action for libel against the editor and publisher of the official organ of the association for publishing an editorial charging plaintiff with immoral and dishonest conduct, rendering him unfit to hold such office. Defendant pleaded justification, and that the publication was made in good faith, and privileged. The court instructed the jury that the fact that the paper in which the publication was made was the official organ of the association "was of no consequence." *Held* error, since it was proper to consider that fact on the question of motive, as well as on the question of privilege.

In Error to the Circuit Court of the United States for the Middle District of Tennessee.

This was an action for libel, brought by John C. Underwood against S. A. Cunningham and the Book Agents of the Methodist Episcopal Church South. The publication alleged to be libelous appeared as an editorial in a weekly newspaper periodical published at Nashville, Tenn., called the "Confederate Veteran." This paper is owned and edited by the plaintiff in error Cunningham, and was published for him by the Book Agents of the Methodist Episcopal Church South, a corporation created under the laws of Tennessee. Underwood was a citizen of the state of Kentucky and Cunningham a citizen of the state of Tennessee. The defendants pleaded separately. There was a verdict and judgment against them jointly for $15,000, and a separate verdict and judgment against Cunningham individually for $10,000. The trial judge directed that a new trial be granted unless $12,000 of the joint judgment should be remitted. This was done, and the motions for new trial were overruled. Separate bills of exception were taken by each defendant, and separate writs of error allowed. Upon a former day of this term the Book Agents, upon motion, were allowed to dismiss the writ of error sued out by them, which was accordingly done, and a mandate awarded. Upon the coming on of the hearing of the case upon the writ of error sued out by Cunningham, the defendant in error asked leave to remit and release the separate judgment against S. A. Cunningham for $10,000, which was objected to by said Cun-

¶ 6. See Libel and Slander, vol. 32, Cent. Dig. §§ 161, 316.

ningham, and allowed over such objection. It was accordingly ordered that defendant be allowed to remit and release said judgment for $10,000 against said Cunningham, which was done. The plaintiff, Underwood, in his declaration, averred that he was, at the time of the publication complained of, the superintendent and secretary of the Confederate Memorial Association, a corporation created under the laws of Mississippi, and in receipt of a salary of $4,000 per annum, and that the said memorial association had been organized and originated by the United Confederate Veterans, a voluntary organization, composed of surviving soldiers and sailors of the army and navy of the late Confederate States of America; that in 1894 one Charles Broadway Rouss, a wealthy merchant of New York City, and an old Confederate soldier, proposed the erection and maintenance in some Southern city of a memorial institute or Battle Abbey in commemoration of the valor and self-sacrifice of those soldiers and sailors who had lost their lives in the service of the Confederacy, and that he would personally give $100,000 for that purpose whenever an equal amount should be contributed by others. This led the Confederate Veterans' Association to organize the Confederate Memorial Association as a means of raising the necessary funds and for erecting and maintaining the memorial abbey proposed. Thus the relations between the two organizations were of the most intimate character, the memorial association being a mere instrumentality employed and controlled by the former. It was in evidence that S. A. Cunningham was a member of the said Confederate Memorial Association, and that his paper, the Confederate Veteran, was the recognized official organ of the Confederate Veterans' Association. The publication alleged to be libelous appeared in said newspaper as an editorial under date of June 1, 1899, and was written by Cunningham. The publication is one of great length, and we forbear setting it out. It is enough to say of it that it included some very detailed and stringent criticism and comment upon the conduct of the plaintiff as an agent and officer of the Confederate Memorial Association, and challenged the propriety of his retention in its service as a person unfit and untrustworthy for so confidential an office.

T. C. Daniel, for plaintiff in error.

John A. Pitts, Baxter Smith, and Firman Smith, for defendant in error.

Before LURTON, DAY, and SEVERENS, Circuit Judges,

LURTON, Circuit Judge, having made the foregoing statement of the case, delivered the opinion of the court.

1. The action was a joint one against two defendants. There was a verdict and judgment against both for $15,000, and a verdict and judgment against Cunningham alone for $10,000. The joint judgment was cut down, upon suggestion of the court and by consent of the plaintiff, to $3,000; and the separate judgment against Cunningham alone has, upon motion of the defendant in error, and by order of this court at a former session of this term, been altogether released, remitted, and set aside. This was objected to by the plaintiff in error Cunningham, upon the ground that the error of the court below in rendering two separate judgments in the same joint action could not be thus cured, and it is now insisted that the action of this court in allowing a remittitur of said separate judgment should not avail the defendant in error in curing the error in rendering separate judgments against joint defendants. The court below, in substance, instructed the jury that, if they found both of the defendants guilty, they should find a verdict against both jointly for such an amount as would compensate the plaintiff for the entire injury done him by the publication; but that if they found that one

of the defendants was actuated by malice, while the other was not, the jury might, if they saw proper, "assess also against that defendant, by way of smart money or punitive damages," such a sum as they saw fit, not exceeding in all the amount sued for in the writ. In another part of the charge he instructed the jury that there was no evidence from which they could infer that the "Book Agents" were actuated by malice, and that they were not "liable for anything but compensatory damages." The court also pointed out with emphasis the evidence which might be regarded as proving the malice of Cunningham, and concluded by saying: "If he was, you would be entitled to give punitive damages as against him, and to give a verdict that would include smart money as against him; but in no event against the other defendant." Although neither the verdict nor judgment as entered upon the journal shows that the separate verdict or judgment against Cunningham was only for "smart money or punitive damages," and the verdict and judgment against the two defendants jointly purely for compensatory damages, we are justified in so assuming from the charge of the court above referred to.

That the court erred in permitting such an apportionment of damages when the plaintiff had elected to sue both defendants in one action is very obvious. Wrongdoers sued together and found guilty in an action for slander or libel, or any other form of tort, are liable for the whole injury to the plaintiff; and the question as to whether one is more culpable than another is of no importance, for each is liable for all the damages, without regard to degrees of guilt. That one may have been actuated by that degree of ill will and evil purpose constituting actual malice does not in any wise justify a division of the damages, so as to throw upon one of two or more tort feasors sued together a responsibility beyond that cast upon the others, whether done by way of compensation or punishment. The common law prevails in Tennessee, where this action was tried, and there are no cases to which our attention has been called which justify the departure from the rule of common law as we have stated it. Gaslight Co. v. Lansden, 172 U. S. 534, 19 Sup. Ct. 296, 43 L. Ed. 543; Railroad Co. v. Jones, 100 Tenn. 512, 45 S. W. 681; Add. Torts, § 1395. It is plain that the error in the charge, if exception had been taken thereto,—which was not the case,—could have been corrected, so far as the defendants were concerned, by rendering a judgment only upon the verdict returned against both defendants. If, on the other hand, a motion in arrest of judgment had been made upon the ground that under the pleadings there could be but one judgment, the error could be corrected by setting aside the separate judgment, and suffering the joint judgment to stand. Neither will this court reverse a judgment for an error which can be plainly cured, without prejudice to another, by a remittitur seasonably assented to. Tefft v. Stern, 21 C. C. A. 67–73, 74 Fed. 755; Hansen v. Boyd, 161 U. S. 397, 16 Sup. Ct. 571, 40 L. Ed. 746; Bank v. Ashley, 2 Pet. 327, 7 L. Ed. 440, 492; Construction Co. v. Seymour, 91 U. S. 646–656, 23 L. Ed. 341.

2. The plaintiff, by innuendoes, has assigned a meaning to several

antecedent sentences or phrases in the alleged libelous editorial, which, in law, they would hardly seem capable of bearing. When antecedent words are capable, as matter of law, of being understood in more than one sense, it is the office of an innuendo to designate that meaning which the plaintiff proposes to establish as the meaning intended by the defendant and understood by those who heard or read them. Townsh. Sland. & L. § 338; Watson v. Nicholas, 6 Humph. 174; Kerr v. Force, Fed. Cas. No. 7,730, 3 Cranch, C. C. 8. An innuendo can neither add to nor change the meaning of the defendant's language, or operate as an averment importing into the case anything which is not a vehement presumption from the precedent words. 13 Enc. Pl. & Prac. 51 et seq. If the plaintiff, by innuendo, has assigned a meaning to antecedent words of which logically they are not capable, the defendant should demur; for whether the language is capable of the meaning designated is for the court. Whether the meaning is, in fact, that assigned, if capable of more than one meaning, is for the jury. Townsh. Sland. & L. § 342. If capable of bearing the sense pointed out by the innuendo the plaintiff is bound by that interpretation, and cannot save his case by proving a different meaning. Id. § 338, and cases cited. The plain meaning which the plaintiff, by his innuendoes, has sought to attach to certain detached sentences or particular imputations in the libelous publication in question, is that he (the plaintiff) was not worthy of continuance in the employment of the memorial association, because he had theretofore been guilty of "immoral," "dishonorable," "dishonest," and "disreputable" acts or conduct. Thus, by one innuendo, the precedent words are averred to mean that plaintiff was so unworthy of the trust reposed in him as to make his appointment an outrage, and require its rescission. By another it is averred that by the antecedent words the defendants meant that the plaintiff was "dishonest, disreputable, and irresponsible," and by another the defendants by the words precedent are said to imply that the plaintiff had been guilty of "improper and dishonorable deportment, that he had begged to avoid newspaper controversy on the subject of that deportment, and that forbearance had ceased to be a virtue." After much demurring, pleading, and repleading, an issue was reached upon a plea, which, while denying all malice or other evil purposes, justifies the several paragraphs made the subject of innuendoes by claiming that the relation which the plaintiff and the defendant Cunningham bore to the Confederate Veterans' Association and its adjunct, the Confederate Memorial Association, was such as to make it the duty of defendant Cunningham, in the general interest of the association, as the editor of the official organ of one association and a member of the other, to point out the unfitness of plaintiff for his office, and that the publication was, therefore, conditionally privileged. That plea also averred "that the several parts of said supposed libel set out in said declaration, the publication of which is admitted, are true in substance and in fact, and that each one of said parts to which innuendoes are made was written, printed, and published, and the entire paper set out in the declaration as a libel is true in substance and in fact, and the same was written, printed, and

published, and were inferences and conclusions drawn from the character and conduct of the plaintiff, which disqualified him from being the agent of said association, and which were known to the defendant publisher at the time of the publication, which was made without malice, and upon which said publication was fully justified, to wit. Defendants here plead and show that at the time of said publication it was known to the publisher, the defendant Cunningham, that John C. Underwood, the plaintiff, was wholly disqualified to be and remain said agent.    It was known to him that said plaintiff had been guilty of the following improprieties and wrongful acts in and about the business about which he was engaged for said association, in and about other transactions, to wit."    Then followed a short statement of a number of alleged specific instances of alleged misconduct, tending to induce the opinion expressed in the publication.    These specific instances of alleged impropriety not being set out in detail, the court ordered the defendant Cunningham to file, upon the demand of the plaintiff, a bill of particulars.    Thereupon the defendants filed a bill of particulars setting forth the matters upon which they would rely in support of their said plea.    In response such a bill was filed, which set out a number of special instances of alleged misconduct. In support of this plea the defendant Cunningham offered to prove one of the specific matters so noticed in the bill of particulars, and it is assigned as error that the evidence was erroneously excluded. The matter arose in this wise:    The defendant Cunningham was in the witness box, and had given evidence not excepted to, when, during his said examination in chief, there occurred the following:

"By Mr. Champion, for Cunningham: We expect to prove there was organized in 1895 what was known as the 'Chicago and Southern States Association.' By the Court: If you want to make an avowal, you can come here and make it. By Mr. Champion, for defendant Cunningham: We expect to prove that this Chicago and Southern States Association was organized in 1895, primarily for the purpose of bringing about a better feeling between Chicago and the Southern states with reference to trade, etc., and also for the purpose of doing honor to a regiment of which Col. Turner was the colonel. Mr. Underwood was made the principal manager of that enterprise, and had charge of its finances,—really organized it in a great measure. And we expect to show that there was a secret arrangement between him and the railroad companies, whereby he was to get five dollars on every passenger that went on that trip. There were five trains, and when this fact was made known to the executive committee, through the secretary, Mr. McNeal, a meeting was immediately held by the executive committee, which resulted in the discharge of Mr. Underwood under a certain compromise arrangement, and he had no further connection with the excursion. This fact was known to Mr. Cunningham at the time he wrote this communication. (Objected to by attorneys for plaintiff.) By the Court: And the court sustains the objection to it, because it is not pertinent in any way whatever to any issue in this case. (To which action of the court defendant Cunningham excepted.)"

The fact that the examination in chief of the witness then on the stand had not been concluded when the above avowal was made, and that it was evidently made to the court at the court's suggestion, and out of hearing of the jury, leads us to the conclusion that it was an avowal of evidence which it was desired to elicit from the witness then under examination.    The truth of any defamatory words is, if pleaded, a complete defense to any action of libel or slander.    The

onus, however, lies upon the defendant, for the falsity of defamatory words is presumed in the plaintiff's favor. A justification must be as broad as the charge, and the whole of a libel must be proved true, not a part merely. But if the libel consist of a number of defamatory statements, and some are proven to be true, the plaintiff can recover damages only for the parts not true. Thus a defendant may justify as to one particular part of a libel in mitigation of damages if the part justified be distinct from the rest. So he may justify as to one part, plead privilege as to another, and deny the rest. 13 Enc. Pl. & Prac. 84; Odgers, Lib. & Sland. 135. "If the words are laid with an innuendo, the defendant may justify the words, either with or without the meaning alleged in such innuendo, or he may do both." Odgers, Lib. & Sland. 135; Newell, Defam. p. 648; Bank v. Bowdre, 92 Tenn. 723, 731, 23 S. W. 131. The effect of the various charges of the libel, with the meaning annexed thereto by the innuendo, is to charge the plaintiff with being an immoral, dishonest, disreputable, and untrustworthy man.

The defendant undertook to justify generally, without distinguishing between the meaning imputed by the innuendoes and a more mitigated sense. Where this is done it is a defense which must be regarded as a justification to the libel as explained by the innuendoes. To sustain such a plea it is necessary to prove the truth of the libel with the meaning averred in the declaration. Atkinson v. Free Press, 46 Mich. 341, 347, 9 N. W. 501. The special matter which the defendant proposed to prove had no direct connection with any conduct of the plaintiff in respect of his duties as a salaried official and representative of the Confederate Memorial Association. But if the facts which the defendant offered to prove were true, and were known to him when he published the libel in question, it would tend to establish the truth of the words imputing unfitness to the plaintiff for the work he was engaged in by reason of acts and conduct which, without explanation, might well go to a jury as tending to show that plaintiff had been guilty of "dishonorable," "dishonest," and "disreputable" conduct, as charged in the declaration. The meaning imputed to the words used by the defendant of the plaintiff having been averred to be that he had been guilty of dishonorable, dishonest, or disreputable conduct rendering him unworthy of trust and confidence, it would be strange, indeed, if the defendant should be prevented from proving specific instances of just such conduct as a defense. Greenl. Ev. (16th Ed.) § 14h; Ratcliffe v. Courier-Journal Co., 99 Ky. 416, 36 S. W. 177; Lanpher v. Clark, 149 N. Y. 472, 44 N. E. 182. The libel as interpreted and explained by the innuendoes is the libel which the defendant undertook to justify. He has, in effect, boldly alleged that the words, taken in the meaning designated by the plaintiff, are true. When justification to so general and vague a charge or collection of charges is pleaded, the justification must be pleaded with such particularity as to give the plaintiff precise notice of the charge he is to meet. Thus, in illustration, it is stated in Odgers, Lib. & Sland., at page 135, that:

"If the libel makes a vague general charge,—as, for instance, that the plaintiff is a swindler,—it is not sufficient to plead that he is a swindler. The de-

fendant must set forth the specific facts which he means to prove in order to show that the plaintiff is a swindler."

This is precisely what the defendant Cunningham did, and, having assumed all the responsibility of such a challenge, evidence tending to prove the truth of his plea was erroneously excluded.

3. Error is assigned upon the ruling of the court that the witness B. M. Hord was not qualified to speak as to the general reputation of the plaintiff, Underwood. The witness was asked by one of the attorneys for the defendant whether he knew plaintiff's general character in Nashville at the time of the alleged libel. Thereupon the following colloquy between the witness and the counsel and the court occurred:

"Witness: His general reputation for morality? Counsel for Plaintiff: State first whether you know it. By the Court: You understand now what is meant by his general reputation for morality,—that is, the estimate in which he was held by a majority of the people here, having talked with them. A. His general reputation? By the Court: Do you know that? A. I know, from having talked with people, what his general reputation is. I don't know of my personal knowledge. By the Court: Understand, you know what the phrase 'general reputation' means,—the estimation in which he is held by a majority of the people here. Now, have you talked to the people in this community, to the majority of them, or anything like that, or have you only talked to those in your bivouac? A. Oh, I have talked to people out of my bivouac, but I couldn't say I have talked to a majority of the people in this community. By the Court: How do you know, then? That is the test. How do you know his general reputation; not what a few people may think of him, but his general reputation? A. His general reputation I can only judge by the majority of the people I have talked to. That is bad. By the Court: The jury must disregard that statement, because that was thrust out without permission of the court, and while the court was trying to find out whether he was qualified to make such statement. By Mr. Champion: I don't understand it is necessary for him to talk to a majority of all the people. By the Court: No; but a majority to whom he has talked might show his prejudice, if he had any, and would not be a test of his reputation in this community. If he knows what his general reputation is here, he may say. He knows or he does not know. Q. You lived here at the time? A. Yes, sir. Q. Talked with a great many people,—enough to satisfy you? A. Yes, sir. (Objection by plaintiff as leading. Objection sustained.) Q. You talked with a great many people? By the Court: How many does he mean by a great many people? Q. State, then, Maj. Hord, if, from the people you talked with, both in and out of the bivouac, you know his general character for morality? By the Court: In this community, whether you know his general reputation; and if you know what this is, you can answer whether you know his general reputation. A. His general reputation— By the Court: State yes or no, whether you know his general reputation, whether you are acquainted with it. A. If I could get it clearly into my mind what is his general reputation. By the Court: I have explained, it is the estimation in which he is held by the people generally; not by a few, or a little number, but generally. Now, do you know that general reputation? Can you answer that yes or no? A. I don't know all the people in the community, but— (Objection by the plaintiff.) By the Court: You can answer that question yes or no. A. But his reputation with those that I know— By Mr. Baxter Smith: You need not tell what his reputation is with them. State whether you know it or not. A. I only know it from hearsay. By Mr. Champion: Do you know enough to know what his reputation was at that time? By the Court: That is precisely what the court is trying to test him about,—whether he knows how he is held by the people generally. You understand what that means,—how he was held by the people in this community generally, what his general reputation is, what the people generally think of him; not a few, or a little number, anything of that sort, but the people generally. You can answer that question

yes or no. Do you know his general reputation or not? A. People generally, as far as I know— By the Court: Answer the question whether you know his general reputation or not. You can answer that yes or no, now. A. Take it as a whole, I would say no."

The general reputation of one inquired about is the estimate in which he is held by the community, and the usual and well-approved method of inquiring into general reputation, or general reputation in respect of any particular trait of character, is to ask the witness whether he knows the general reputation of the person in question among those who know him, and whether that reputation is good or bad. Greenl. Ev. § 461; Ford v. Ford, ·7 Humph. 91; Gilliam v. State, 1 Head, 38, 73 Am. Dec. 161; Gifford v. People, 148 Ill. 173, 35 N. E. 754; Robinson v. State, 16 Fla. 835. Ordinarily, the value of the witness' evidence may be left to be determined by a cross-examination as to the extent and means of his knowledge of the reputation borne by the person inquired about. It is, however, not unusual, nor improper, on objection to require the party offering the witness to show, before allowing the witness to speak, the knowledge which the witness has of the general reputation of the person in question. The witness' knowledge of reputation must for the most part be derived from what he has heard others say upon the subject. But it is a great mistake to suppose that unless the witness has talked to a majority, or any other large proportion, of a community, that he is not qualified to speak. Nashville is a city of about 100,000 people. In a "community" so populous it might well be that a very small number of persons would know anything whatever about a particular inhabitant, and that a still smaller number had been heard by a witness to say what was thought or said of the person inquired about. The "community" whose estimate of character is to be ascertained is, therefore, composed of those called by some jurists "his neighbors," by others "his associates or acquaintances," and by still others as those who are "conversant" with him. The provable general reputation of one is, in a large sense, the prevailing estimate concerning the person inquired about entertained by the community thus defined. It must follow,· therefore, that it is not necessary that a character witness shall be able to say that he knows what a majority, or any other particular number, of the persons conversant with the person inquired about say about him. If the witness has heard enough to enable him to say that he thinks he knows the prevailing opinion entertained of him by his acquaintances, he is competent to speak, subject to cross-examination as to sources, extent, and correctness of his information. Gifford v. People, 148 Ill. 173, 35 N. E. 754; 1 Greenl. Ev. § 461; State v. Turner, 36 S. C. 534, 15 S. E. 602; 5 Am. & Eng. Enc. Law, 880; Robinson v. State, 16 Fla. 835; Ford v. Ford, 7 Humph. 92; Pickens v. State, 61 Miss. 563; State v. Reed, 41 La. Ann. 581, 7 South. 132. One cannot read the colloquy set out above without reaching the conclusion that the witness was qualified to speak, but was repressed by the effect upon his mind of the plainly erroneous instructions from the court that general reputation "is the estimate in which he is held by a majority of the people here, having talked

with them." In subsequent parts of the colloquy this was reasonably modified and corrected, but it is plain that the witness continued to rest under the belief induced by the ruling and instruction of the court that he could not speak because he had not "talked with" a majority of the whole people of Nashville. The error of the trial judge went so to the root of the whole matter in his original instruction that nothing less than a very clear and pointed correction could possibly cure the effect upon the witness. The question of the character of the plaintiff was put in issue by the plea of the general issue, and evidence was competent in mitigation of damages. If the plaintiff was a person of tarnished reputation, it was competent for the defendant to show it, for such a plaintiff cannot have received much damage. Hackett v. Brown, 2 Heisk. 264–277; Drown v. Allen, 91 Pa. 394; 1 Greenl. Ev. § 424; 13 Enc. Pl. & Prac. 72; Post Pub. Co. v. Hallam, 8 C. C. A. 201–207, 59 Fed. 530; Duval v. Davey, 32 Ohio St. 604; Randall v. Association, 97 Mich. 136, 56 N. W. 361; ——— v. Moor, 1 Maule & S. 284. In ——— v. Moor, cited above, Lord Ellenborough said: "Certainly a person of disparaged fame is not entitled to the same measure of damages with one whose character is unblemished, and it is competent to show that by evidence." The exception taken was sufficiently definite under the circumstances shown by the colloquy, as the court could not possibly fail to know the ground upon which his ruling was objected to.

4. Several errors have been assigned upon the charge of the court. So far as the assignments are pointed at the instructions of the court as to certain parts of the publication being libelous per se, it is enough to say that the only exception to the charge of the court in respect to that subject is a general exception "to the portions of the charge wherein it is stated that certain parts of the publication are libelous per se." As there were a number of parts of the publication construed to be libelous per se, this exception is applicable to each one. As some parts of the publication were confessedly libelous per se, all questions of truth or privileged occasion out of the way, the exception is too broad, and therefore bad. It is not admissible under so broad an exception to assign error upon a single one of many paragraphs of a charge, some sound and some unsound. All must be alike erroneous to save so general an exception. The court instructed the jury that the evidence did not show that the publication in question was conditionally privileged. We are unable to find any exception to this part of the charge.

5. The court instructed the jury that the fact that the newspaper owned and edited by the plaintiff in error Cunningham, and in which the publication in question was made as an editorial, was the official organ of the Confederate Veterans' Association, was of "no consequence in the case, so far as I can see." This was error. For the purpose of rebutting malice it was competent to show the relation which Cunningham and his paper bore to the veterans, also represented by Underwood, and evidence showing a good purpose in making the publication was clearly competent to rebut malice. It was also competent upon the question of conditional privilege. In

Hunt v. Railway Co. [1891] 2 Q. B. 191, Lord Esher said: "If the communication was of such a nature that it could be fairly said that those who made it had an interest in making such a communication, and those to whom it was made had a corresponding interest in having it made to them,—when these two things do exist,—the occasion is privileged." Insurance Co. v. Buckner, 39 C. C. A. 20–29, 98 Fed. 222. Of course, the privilege will be lost if the statement is made to an unnecessarily large number of persons, which is ordinarily a question for the jury. Fras. Lib. & Sland. 127. Nor will mere belief in the truth of defamatory statements afford a defense, and there "will be no privilege if the statement contains exaggerated and unwarrantable expressions." Fras. Lib. & Sland. 128. To say to the jury that it was of no consequence what the relation of the Confederate Veterans' Association was to the paper published by Cunningham was to deprive the defendant of the bearing of that relationship upon the question of motive or malice, as well as upon the question of privileged occasion.

For the errors indicated, the judgment as to plaintiff in error Cunningham will be reversed, with costs, and a new trial awarded.