# ROCHE v. WASHINGTON GAS LIGHT COMPANY.*

CORPORATIONS; MASTER AND SERVANT; MALICIOUS PROSECUTION.

1. Where a corporation is sought to be held liable for the wrongful or malicious act of its agent or servant in causing another to be prosecuted for larceny, it must be made to appear that he was expressly authorized to act as he did by the corporation, or that the corporation ratified his act.

2. A gas light company is not liable to one of its former servants in an action by the latter for malicious prosecution for an alleged larceny of the company's property, where the superintendent of one of its departments, having general authority to look after and protect the property, caused the arrest and prosecution of the plaintiff, in the absence of evidence to show that the company either directed the superintendent to act, or approved or ratified his act after it was committed.

No. 2780.   Submitted April 29, 1915.   Decided May 24, 1915.

---

*Master and Servant—Malicious Prosecution—Liability.—For cases passing upon the liability of master for malicious prosecution by servant, see notes to Mulligan v. New York & R. B. R. Co. 14 L.R.A. 791, and Ritchie v. Waller, 27 L.R.A. 195; as to liability of municipal corporation for malicious prosecution by its officers, see note to Doyle v. Sandpoint, 32 L.R.A.(N.S.) 36; and as to liability for malicious prosecution by agent authorized to collect debt, see note to Russell v. Palatine Ins. Co. 51 L.R.A.(N.S.) 471.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court, on a verdict directed by the court, in an action to recover damages for an alleged malicious prosecution.

*Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an action by William F. Roche against the Washington Gas Light Company, a corporation, to recover damages for malicious prosecution. There was a plea of not guilty.

As recited in the bill of exceptions, plaintiff testified that he is fifty-six years of age and had been employed by the Washington Gas Light Company for a number of years, from 1877 until about 1885, and from 1889 until December, 1912; that he had charge of the stables, and after they cut the horses down, he ran a boiler and looked after the stable; that he has been in charge of the stable for ten years, receiving $15.75 a week; that on Monday, December 9th, witness was in the boiler room; that he was having trouble getting up steam, the boiler wouldn't take water. Called Blackman in, but he was busy with his automobiles at the time, and finally Baker, the foreman of the shop upstairs, and the man in direct charge of witness, and Crowley, the assistant foreman, came in; that they were in the boiler room over two hours, trying to make the boiler take water. Blackman was there, but he couldn't stop, as he had to attend to his other work, and after he got his machine out he came to assist us. Blackman walked out to get a smaller wrench or something, and was gone about ten minutes; that he came back and asked witness if he had given a piece of harness to a colored fellow. Witness replied that he had not, and thereupon Blackman said he had seen a yellow fellow going out of the alley with a saddle and a piece of harness on his shoulders; that witness said that must be Posey; that Posey worked there extra; that at times witness had him clean out the stable in the morning, but had not employed him for a month. Witness went out of the alley as far as D street looking for Posey, but that he did not see Posey until Saturday, when he was arrested; that two or three

months before Posey took the harness, witness reported to Baker, the foreman of the meter shop and witness's boss, and the person to whom witness reported, that somebody was stealing white lead and metal; that Baker said, "Don't say anything, we will try to catch whoever is doing it, keep quiet, lay low." Two or three weeks before this thing occurred Baker brought down three or four pigs of lead he found in the stove department, hid under the stoves. This fellow Posey used to run up in the stove department. On that morning he did not find Posey, and returned in ten or fifteen minutes to the boiler room, where he found Baker, Blackman, and Crowley, and told them he could not find Posey. On Saturday morning policeman Elliott brought Posey to witness to be identified; that nothing was said to witness by anybody. About 5 o'clock Saturday evening witness was arrested by detective Howes and officer Elliott, taken to the First Precinct, searched and locked up. He was detained an hour or an hour and a half, when he succeeded in obtaining collateral. He came down on Sunday morning to attend to the work, and Sunday afternoon about 3 o'clock witness came there to get the key and go do his work, and Mr. Emory told witness he was suspended until this court matter was settled, and that there was a man over there to do the work; that witness told Emory it would be settled Monday. That witness went to court on Monday morning and was dismissed. That the three colored men testified and plaintiff had his witness, to whom the judge would not listen at all, and the judge said, "Dismiss the case." That after the case was tried in the police court, witness went back to Emory to see if he would put him to work, and that Emory said he did not know whether the case had been settled or not. Witness asked Mr. Emory, "It is not a personal matter with you, is it?" That Mr. Emory said, "No, it is not a personal matter. I want the thing straightened out." That witness said to Mr. Emory, "You had your men up there at the court, and I have been there and was declared not guilty by the judge, and this is Christmas week, just before Christmas, and I do not want to lose any time. I have a big family." Mr. Emory said, "You will have to wait until I send for you."

Emory sent for witness two or three days after that. Witness went down, and went to work in the pipe shop for about an hour, when Emory sent him down to the Maryland avenue holder; that witness was not physically able to do the work; that witness stayed down there about an hour and a half, and came back and went home without reporting to Emory.

On cross-examination witness said he had a great deal of complaint about things being stolen, principally lead. That he recalls the day that Blackman told him about the man stealing the harness saddle; witness said he had suspected Posey, and had accused Posey to his face two months before this. Witness said that this lead which was melted by him in the boiler room was taken out by colored men and carried from the boiler room to the storeroom. Witness said the lead was brought in to him, and that he melted it and put it on the floor. Witness said that when he was in the boiler room he does not believe that anyone could come in without his knowing it; that when he left at night the door was left open or pulled to; that there was no key to the door of the boiler room. Witness said that the lead melted by him would lie on the floor for several days, sometimes two or three weeks, before it was taken away; that sometimes it was all piled up before it was taken away; that it was very seldom ever cleaned up entirely; that he had employed Posey and other colored men to help him clean up the stable. Used them ten or fifteen minutes in the morning. Would have to pay them out of his own wages. That Posey had not been employed by him in any capacity for more than a month before this occurrence; that he had been working upstairs on the stoves for the gas company, working for John Moriarty. Witness said Posey was hired by Moriarty to move the stoves, and Moriarty used to call in help when extra stoves would come in. Witness said he never sent Posey or anyone else to a junk shop or anywhere else with any lead to sell. When the officers came to him they did not have a word of conversation with him about the theft of these articles; they simply asked him if his name was Roche, and when he said that it was, they said they wanted him over at the station house; that they took him to the station

house and put four charges of larceny against him. Witness said that the reason he asked why they would believe the colored men in preference to him was that the colored men, Posey, and another colored man, whose name witness did not remember, were in the cells, and that they both made a charge that witness gave them the lead, and gave them this set of harness; that both made a charge in witness's presence in the cell room that witness had given them the lead. Witness was asked if he was told by the detectives that witness was arrested because these two men had made this charge against him and witness replied, "I guess so."

On redirect examination witness testified that he did not take any of the lead; that he did not take any of the harness; that he gave no instructions to Posey or to Green or anyone else to take anything; that he never allowed anybody to take anything out of there unless it was somebody authorized to do it; that he never had any complaint before from any officer or employee of the company that he did.

George W. L. Blackman testified that he was employed in December, 1912, by the Washington Gas Light Company, repairing automobiles and having charge of the men who ran them. He recalls that in December there was some trouble with the boiler; that they could not keep any water in it; that witness, being in the boiler room, left there to get some tools, and when he was coming back he saw a colored man go out of the door with a piece of harness. That there are two doors to the stable, the boiler room is in the corner. That the door was not very far open; and witness ran there and called to him; that he did not come, of course; that witness knew his face, but did not know his name; that he went back and told Roche and Roche went out. Witness went to the office and reported to Mr. Emory what had happened and asked what witness should do; that Mr. Emory told him to go and see what he did with the harness; that when witness had got out front the fellow had disposed of the harness and was going back to this alley where he lived. Witness then met Mr. Elliott and told him about it, and Mr. Elliott came in and talked to Mr. Emory. Mr. Elliott said

he could get this man, but that witness would have to get out a warrant for him.     That Mr. Emory went up,—said he was going to see what to do about it, and when he came back he said, "Go ahead and have a warrant out for him," meaning Posey. Witness swore to a warrant for Posey's arrest.     Thereafter the officer came over to the gas company and arrested Mr. Roche; that witness believes they sent for him, and that Mr. Elliott, Mr. Emory, and witness were in the room.     Mr. Elliott told Mr. Emory that there was a whole lot more coming out of this, that he thought Mr. Roche was implicated, and that he did not think it was these colored men.     Mr. Emory then went upstairs before saying anything.     When he came back he said he had seen him.     Witness thinks he meant the secretary to one of the officers of the company.     When he came back he told witness he would have to go with Mr. Elliott, and do what Mr. Elliott tells you, so witness did.     He went up to the police court and he there filled out some sort of a blank; that they asked witness what they had lost and the value; witness answered the questions as best he could and swore to it.     Witness said they got a warrant for Posey, and then, the way he understood it, they changed it to Mr. Roche.

Plaintiff introduced two informations charging the plaintiff with larceny of scrap lead of the value of $2\frac{1}{2}$ cents per pound, property of the Washington Gas Light Company, sworn to by the witness.     Another information charging the plaintiff with larceny of one harness saddle of the value of $5, the property of the Washington Gas Light Company, and also sworn to by the witness.

The police record of the three cases against the plaintiff contains the following statements thereon, "Information for larceny; plea, not guilty; defendant in open court waives his right to be tried by a jury in this case, and requests to be tried by the court; judgment, not guilty; defendant discharged."

Witness further testified that when he saw the man going out of the stable door, he ducked over to the stable door and slipped around pretty quick, and by the time witness got out of the stable the man with the harness was at the mouth of the

alley going to D street; that witness called to him, but could
not stop him. Roche called him, but he paid no attention to
him. That Posey testified on the stand that Mr. Roche told
him to take it and sell it and bring the money to him or some-
thing; witness does not remember just what was stated by those
fellows, as he did not pay much attention to what they said as
it was nothing to witness; that Mr. Roche went on the stand;
that the court found him not guilty, and discharged him.

On cross-examination witness testified that he thinks he went
to the police court to swear to the ownership of the property
and the value of it; that he was present when the information
was written up, and the detective and officer told the district
attorney, or whoever it was that made out this warrant, as to
what goods were stolen and the value of it; that there was no
other employee of the gas company at the police court when the
information was sworn to. Witness never saw any buckets of
lead outside the coal room in the alley; that he knows there were
a lot of things stolen; that witness's tools were taken, and other
things; that he reported about the harness to Mr. Emory, and
Mr. Emory told him to follow the man and see what he did with
it. That Roche went out of the boiler room after the man im-
mediately after witness reported what he had seen; that he did
not remember the date of the conversation which took place be-
tween Mr. Emory, officer Elliott, and himself, at the time Mr.
Emory told him to go to the police court and do what the officers
told him,—whether it was just before they went up to the court
or not; does not know whether it was the same day or not, but
he knows that Mr. Roche had been arrested at that time. The
witness testified that the first time he was at the police court
was to swear out a warrant for Posey; that "we went to the
court on two different occasions. If I remember right, we went
there and swore the warrant out for Posey, and they locked up
Posey, and Posey implicated another fellow and they locked him
up. We had the two locked up, and then they blamed it on Mr.
Roche. Then they locked Mr. Roche up, and when we went up
there I supposed they were going to prosecute these two men,
Posey and this other man, and then they changed it from them

to Mr. Roche. That was talked over at the office when we went up there to prosecute these colored men, and then was when Mr. Emory instructed me to do as Mr. Elliott said." It was then that Mr. Emory gave instructions to do as officer Elliott told him to do.

The court recalled witness Blackman, and on being examined by the court he testified that he had been employed by the gas company about seven months when Mr. Roche was arrested; that when he went there Mr. Emory's position with the company was that of superintendent of the meter installation department; that Mr. Emory employed and discharged men; that Roche was one of his men; Roche came under Mr. Emory, and could have been discharged by him at any time. The work done by Roche in connection with the melting of lead was in connection with the meter department, and the blocks of lead melted by Roche were used in the meter department.

On cross-examination by defendant, witness testified that Roche took all orders from Mr. Emory regardless of what they were. The duties of Mr. Emory in that department were to see that the men did all right, and to look after the company's interest in general. Witness was asked what he meant by "the company's interest in general," and stated that when a man running one of the trucks ran into a wagon and hurt someone, that the officers of the company did not go down and get after the driver of that truck, they got after Mr. Emory, and Mr. Emory would jump on those fellows for it, and that is what he meant by general interests.

On redirect examination witness testified that when Emory left the room on the occasion of the interview between witness, Mr. Emory, and officer Elliott, Emory said, "Wait until I go upstairs and see;" that Mr. Leiter's office was up a flight of steps, and fifteen or twenty paces to one side; that when Emory left witness and officer Elliott, he went towards Mr. Leiter's office and stayed about five or ten minutes, and it was after he came back that Emory told witness to go ahead and do what the officer said.

The defendant introduced the evidence of Percy Elliott, who

testified as follows: That he is a policeman; that complaint was made that material had been stolen from the gas company's stable; that Blackman told him he had seen a colored man take some harness, and witness told Blackman to get a warrant for this man. Blackman obtained a warrant upon which witness arrested Posey; that Posey told witness that the harness had been given to him by Roche, and that he had been selling lead for Roche. Posey said there was another colored man by the name of Green mixed up in it. A short time after that witness arrested Green, who told the same story that Posey had told about Roche giving him lead to sell; that after locking Posey up, witness had an interview with Mr. Emory, stated the circumstances under which he had made the arrest, and asked Mr. Emory if he suspected lead was being stolen. Mr. Emory said he did not; that nothing was said by Emory about Roche or about bringing charges against him. After leaving Emory, detective Howes and witness arrested Roche. Witness testified that he did not tell Roche, nor did detective Howes tell Roche, that he was being arrested by direction or at the request of Mr. Emory. Witness next saw Emory Sunday or Monday morning, and told him to have somebody in court on Monday morning for the purpose of identifying the goods and giving the value of them; that Blackman came and gave the valuation of the lead and harness, and witness thinks this was the only information he gave.

Cross-examined witness testified that he had no interest in the case whatever; did not tell Mr. Blackman on the morning of the trial that if he went on the stand and swore to the facts he had sworn to in the information he would get himself in trouble. Positive he said nothing of the sort. That he talked with Mr. Gardiner on the morning of the trial. When asked if he did not tell Mr. Gardiner the morning of the trial that witness talked to Emory about Roche, and that witness told Emory that witness wanted to arrest Roche, and that Emory told witness he did not believe Roche was guilty, the witness replied: "That was afterwards, after the arrest was made. That was on Sunday or Monday." When asked if he had not testified that

Roche's name was not mentioned, the witness replied: "At that time, no." Asked if he did not testify to two interviews he had had with Mr. Emory, and that in those interviews nothing was said about Roche, the witness replied: "Not until after the arrest was made. I testified that I spoke to Mr. Emory after the arrest was made. The question was asked me if I had spoken to Mr. Emory before the arrest was made about Mr. Roche." Witness said he went to see Emory after the arrest was made and all that witness told Emory was that he wanted somebody to go up there and identify the goods. In conversation with Mr. Gardiner the morning of the trial, witness told Mr. Gardiner that in an interview with Emory on Sunday or Monday, witness told Emory that he thought Roche had committed the act, and Mr. Emory replied: "I don't believe anything of the sort."

Defendant called Mason L. Howes, who testified in substance that he, with officer Elliott arrested the plaintiff. Had talked with Green and Posey, the two colored men. Green was locked up on one side of the corridor and Posey on the other. Green told witness he had received lead from Roche on several occasions, which he had taken to a junk shop on Eleventh street and sold. Green told him the proceeds of the sale had been divided with Roche; that Posey told witness practically the same story as the other man. One of them said he had taken a saddle. Posey told him he had taken lead to the junk shop, sold it, given Roche the proceeds, which had been divided between them; said also that they carried the lead away in a galvanized pail, and that we would find the pail behind a little upright boiler in the stable over in the alley. Witness went to the stable and found another man, Ellis. Asked Ellis if he had sold any lead, and that Ellis stated he had never sold any lead for Roche, but that he had been approached by Roche and asked to take lead down on Eleventh street and sell it, but he did not like the looks of the transaction, and refused to do it. He had seen Roche come there and inquire for Posey and have him go down with the lead. He had also seen them divide the proceeds. After the interview with Ellis witness saw Emory and asked

him if he had a man employed by the name of Roche, to which he replied that he did, and stated where he was employed. Witness then asked if he had charge of the building there, or had access to the lead, and was told that he did. Witness then asked him if he had any suspicions of Roche, to which Emory replied, "None." Witness told Emory that Roche was the guilty party, to which Emory replied: "It is up to you, gentlemen, I make no charges." Those present at the interview were officer Elliott, Mr. Emory, and witness. After the interview witness and officer Elliott went around to the alley and had a conversation with Roche, and Roche denied having anything to do with the lead whatever. They found the galvanized pail there just as the two colored men had told them. Witness went around on Eleventh street later to find out to whom the lead had been sold, and, if he remembered correctly, the man who bought it was an unlicensed dealer. He was arrested. Found that this junk dealer had bought all the lead that was complained of being stolen. Witness arrested Roche before seeing the junk dealer.

When asked the question, "You have detailed the circumstances leading up to the arrest of Mr. Roche, of course. I will ask you what impression these facts and statements of witnesses created upon your mind with respect to the probable guilt of the plaintiff?" Witness replied, "I thought Roche was guilty." Nothing was said to witness or Elliott in witness's presence by Mr. Emory with respect to arresting Roche. Witness was not certain whether Posey and Green were released Saturday night or held over until Monday morning. That witness was present when the information against Roche was drawn up, and that witness gave the information as to the statements contained in it. No one connected with the gas company had requested him to give such information. That Elliott and the witness made the change from the prosecution of Posey and Green to the prosecution of Roche. Posey and Green testified in court to the same statements they had made to witness, and witness thinks Blackman testified as to the ownership of the property and its value.

Cross-examined, witness testified that as a rule when he makes

an arrest he examines the police record of the person, but he did not look up the records of these two colored men. These men did testify in the police court that they had been arrested several times, but witness does not remember for what. He let the two colored men go about the same time that he arrested Roche. Witness told officer Elliott he had locked up the wrong parties. Witness talked with Roche before he arrested him, that is, at the time of making the arrest. Asked Roche about the lead, and told him what Posey, Green, and Ellis had said about it, and told him about the galvanized pail. Roche denied it, and said that the pail had not been out of the place. Emory evidently did not think Roche guilty, as he was very guarded in his statement, told us that it was up to us, gentlemen, that he made no charges.

Defendant called John R. Emory, who testified in substance that he is superintendent of complaints, meters, and installation of the Washington Gas Light Company; that he knows plaintiff; that plaintiff had charge of the stables, and looked after a boiler which supplied steam for the meter shop; that complaints had been made of things being stolen from the shop back there; that the men individually complained of having lost tools; that he never had any complaints from the plaintiff; that Blackman was a machinist under the witness in the automobile repair shop; that on the occasion in question Blackman came to the witness and stated he had just seen a negro running out of the garage with one of the harness saddles. Blackman asked witness what to do, and witness, after consulting Mr. Leiter, told Blackman to swear out a warrant for the negro for the reason that he was an eyewitness to this theft, and the proper person to swear out a warrant.

Witness was asked why he consulted Mr. Leiter, and replied that he had no authority to instruct any person to swear out a warrant. That officer Elliott and detective Howes came to him and asked if he had a man employed under him by the name of Roche. Witness told them he did; that he looked after the boiler and was in charge of the stable. They told witness that Roche was guilty, and witness stated that was a matter which

concerned them, and that he made no charges against Roche and had no suspicions. The matter was entirely in their hands. That he made no charges whatever. That he did not know of Roche's arrest, until after he had been arrested. That he did not request detective Howes or officer Elliott to arrest Roche or take any action whatever against him; that he saw Roche the Sunday following his arrest and witness said to him: "Roche, I understand you have been arrested and that charges have been preferred against you criminally; you will have to lay off until those charges are settled with your accusers and the court." On Monday morning officer Elliott came in and said that it would be necessary for the company to be represented by somebody, and asked Emory if he would go down. Emory replied: "No, Blackman was the eyewitness to the taking of this saddle; he was the only man, so far as I can learn, who was in it, and he would be the man to go down." "If I went down, there is nothing I could say." . The name of Roche was not mentioned in the conversation. That the case witness had reference to was the stealing of the harness saddle by Posey.

On cross-examination the witness said that when Elliott came to see him on Monday morning, at the time he made the request that somebody go down to the court, Blackman was in the room. When officer Elliott told him it would be necessary for the company to be represented by someone, witness did not state, "Wait a minute," and go upstairs; that was at the time that Blackman came and told witness he had seen the negro running out of the garage. He did not go upstairs on Monday morning when officer Elliott was there to see Mr. Leiter because he had Leiter's authority to instruct Blackman to swear out a warrant against Posey; that he knew that Posey had been arrested on Saturday, and that Posey was the case that witness was dealing with entirely. He knew that Roche had been arrested at that time, but witness had clearly explained to officer Elliott and the detective that he had no suspicion of Roche, nor would witness in any way enter any charge against him. Witness could not recall whether or not when he saw Roche on Sunday Roche told him that the trial would be the following morning, and would

then be cleared up; that possibly he might have said so. Witness testified that he knew Roche's trial was to be on Monday morning, but did not know that the officers were then after Roche, and not after Posey; that he had not heard a word about it; witness whole case was in regard to Posey. The first thing the detective said to witness was whether he had a man under him by the name of Roche. When witness replied, "Yes," he was asked if he had any suspicion of Roche, and the witness answered, "No." "I never had the slightest suspicion against him." Did not know that Posey had been let out of the station house. Elliott did not say to the witness, "We want someone there to represent the company in the Roche case this morning," that he is positive that Roche's name was not mentioned. That Roche came to the witness and said, "You ordered me arrested." To which witness replied, "I didn't order you arrested. I had nothing to do with it whatever." Roche said, "Your name is signed over at the First Precinct." The witness replied, "If it is, it is a forgery. I haven't been near the First Precinct."

William Posey for the defendant testified that his right name was William. He was called Jim, and that was the reason they had it James. Was arrested by Elliott for stealing the harness saddle from the Washington Gas Light Company. Told Elliott that he used to work around cleaning up for Mr. Roche in the morning, and Mr. Roche used to pay him for it. That on the morning witness took the saddle Roche told him to take the saddle out and sell it. That he had taken the saddle and sold it to a countryman for a dollar, which he brought back and gave to Roche. Witness also told Elliott that Roche used to take buckets of lead, set them out in the alley, and call witness and another colored man, Green, to come around and get them. Witness did not know that Roche had stolen the lead. He would sell it, give the money to Roche, and then get 25 or 30 cents, whatever Roche gave him.

On cross-examination witness testified that he had never been arrested for stealing; that he had been arrested for fighting and the like of that. He said that Roche was in the stable melting lead when he gave witness the saddle. Came out and told wit-

ness to take the harness; that he did not call witness to the
boiler room and tell witness to go get the saddle; that Roche
came out in the stable and handed the saddle to the witness.
Brought back the dollar and gave it to Roche; that Roche gave
witness a quarter and told him to go around and get a half pint
of Chark whisky.

Henry Green testified that officer Elliott asked him if he
knew anything about this lead; if witness had ever sold any
for Mr. Roche, and if Roche ever gave witness anything for
selling it. Witness told him, "Yes." Witness told Elliott where
he sold it and what he did with the proceeds. Always brought
the money back with the ticket, and Roche paid him for his
trouble. Made the same statements to detective Howes. Was
in the police court on Monday morning and had testified the
same there as he had testified in this case. Witness testified
that he was arrested three times for intoxication, but never for
stealing. That he had worked for the gas company a number
of times in the stove department. Did odd jobs for Roche be-
fore they installed the automobiles. He would clean the stable
out and Roche would pay him for that. Last time he got any
lead was in the month of December; that Roche gave him the
lead a number of times, and that he got it on the outside, near
the boiler room; that he would take the lead and sell it and bring
back whatever it brought; that Roche would give him money
for carrying it down.

On recross-examination witness testified that he was locked
up from Saturday night until Elliott took him over to the court
on Monday morning; that he was in the same cell during the
whole time he was locked up. Did not testify in the police court
that he had been arrested and convicted of larceny. Witness
was asked, "Didn't the officer tell you that they wanted to get
Roche and were going to let you all off if they caught Roche?"
He replied that "Mr. Howes made that statement at the station
house." When asked if the officers did not say that "if they
got Roche and convicted him, they would let you all off," the
witness replied, "No, sir, he didn't make that statement. He
made the statement in regard to getting Roche;" that the officer

**did** not make any statement about letting the colored men go; that the officer said, "You boys just tell us what you know about it; that is all there will be to it." Witness testified that the officer said to him, "Green, where have you been getting this stuff?" and the witness told him. The officer then said, "What did you do with it?" and witness told him. The officer then asked him what he did with the money, and witness told him that he brought it back and gave it to Mr. Roche, and that Roche would pay witness for his trouble; but the officer did not tell witness that if witness told him that, that would be the end of it so far as witness was concerned. The officer just said, "If you tell us what you know, it will be much easier on you."

Defendant offered George Ellis, who testified that he is a blacksmith, working in a shop on Twelfth street; that he knows Roche; that he knew Posey and Green had been arrested in December, 1912, for stealing lead in connection with Roche; that he saw Elliott and Howes in December, 1912, and was summoned to the police court, but did not get there in time; that before he was summoned one of the officers came down there after witness to come up that day, and that he told the officer that he had seen Roche getting this lead and giving it to those boys. Howes asked witness if he knew Roche, and witness told him he did, and had seen Roche take the lead and put it in a tin bucket and give it to those boys, and they would carry it out and sell it, bringing the money and slip showing how much they got for it back to Roche.

On cross-examination witness said he was only arrested once in his life, and that was for fighting; never for stealing. That he saw Roche many times go and call those boys to come around and get this lead. Had often seen Roche put lead in a tin bucket in the boiler room, and saw the boys take it and sell it and bring the money back and give it to Roche. Witness never took any of the lead to sell.

William Edward Baker testified that he was employed by the Washington Gas Light Company as foreman in the meter shop; that he knows Roche, and Roche never complained to him about things being stolen from the shops.

On cross-examination witness testified that Roche never told witness about three weeks before Roche was arrested that anything was being missed around there, and that Roche suspected Posey of doing it. Witness never knew who Posey was. Roche never told witness things were being missed and that someone was stealing them.

Defendant read into the record a stipulation of counsel that if Joseph Leiter were called as a witness on behalf of the defendant company, he would testify that in December, 1912, and for some time thereafter, he was president of the Washington Gas Light Company; that he never requested or directed John B. Emory, superintendent of complaint, meter, and installation department of the company, or anyone else, to swear out a warrant or information for the arrest of the plaintiff, William F. Roche, or to take any steps of any kind whatsoever to cause his arrest and prosecution on any charge whatsoever; and that he never sanctioned or approved the arrest and prosecution of said William F. Roche; and that he did not know said Roche had been arrested until probably three weeks or more after his said arrest.

Upon the conclusion of the testimony defendant's counsel moved for a directed verdict. This motion was overruled at the time. After recess the court heard counsel in argument with respect to the prayers for instructions.

The court announced that he would direct the jury to find for the defendant, because if the case should go to the jury, and they found for the plaintiff, he could not allow the verdict to stand on the testimony.

Before the jury retired counsel for the plaintiff asked the court's permission to amend his declaration to the effect that the gas company directly procured the warrant upon which he was charged. The court overruled the motion, announcing that he would give the plaintiff leave to withdraw a juror, but did not think the court should be put in the position of having brought before it a new declaration and a new cause of action after the testimony was in.

The court announced that under his view of the testimony

he was inclined to allow plaintiff to amend his declaration. However, the court did not think that under the amendment he could do otherwise than instruct the jury to return a verdict for the defendant.

Plaintiff objected to the ruling of the court and assigns error thereon.

*Mr. W. Gynn Gardiner* for the appellant.

*Mr. B. S. Minor* and *Mr. Colley W. Beall* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

The principle is well settled that where a corporation is sought to be held liable for the wrongful or malicious act of its agent or servant for putting the criminal law in operation upon a charge of larceny, it should be made to appear that he was expressly authorized to act as he did by the corporation, or that the corporation ratified his act. *Lake Shore & M. S. R. Co. v. Prentice,* 147 U. S. 101, 37 L. ed. 97, 13 Sup. Ct. Rep. 261; *Washington Gaslight Co. v. Lansden,* 172 U. S. 534, 43 L. ed. 543, 19 Sup. Ct. Rep. 296; *Bank of New South Wales v. Owston,* L. R. 4 App. Cas. 270, 48 L. J. P. C. N. S. 25, 40 L. T. N. S. 500, 14 Cox, C. C. 267, 25 Eng. Rul. Cas. 124; *Allen v. London & S. W. R. Co.* L. R. 6 Q. B. 65, 69, 40 L. J. Q. B. N. S. 55, 23 L. T. N. S. 612, 19 Week. Rep. 127, 11 Cox, C. C. 621; *Mulligan v. New York & R. R. R. Co.* 129 N. Y. 506, 511, 14 L.R.A. 791, 26 Am. St. Rep. 539, 29 N. E. 952; *Fisher v. Westmoreland,* 101 Miss. 180, 189, 57 So. 563, Ann. Cas. 1914B, 636; *Moore v. Cohen,* 128 N. C. 345, 38 S. E. 919; *Daniel v. Atlantic Coast Line R. Co.* 136 N. C. 517, 67 L.R.A. 455, 48 S. E. 816, 1 Ann. Cas. 718; *Carter v. Howe Mach. Co.* 51 Md. 290, 298, 34 Am. Rep. 311; *Baltimore & Y. Turnp. Road v. Green,* 86 Md. 161, 37 Atl. 642; *Beiswanger v. American Bonding & T. Co.* 98 Md. 287, 57 Atl. 202; *Markley v. Snow,* 207 Pa. 447, 64 L.R.A. 685, 56 Atl. 999.

Emory was the superintendent of one of the departments of the gas company over which he had a general authority to look after and protect the property in his charge and possession, and all the ordinary authority connected with that position, yet he was not empowered to put the law in motion against one suspected of the theft of that property unless he had express precedent authority. He showed his knowledge of this want of authority by procuring the express direction of the president of the company, who occupied the same building, before authorizing the arrest of Posey.

Assuming that the evidence has a tendency to show that he authorized Blackman to prosecute Roche, there is nothing to show that the corporation either directed him to act, or approved and ratified his act after it was done.

We find no error in the direction of the verdict, and the judgment is affirmed with costs.                              *Affirmed.*