WALKER et al. v. KELLAR.   (No. 6324.)

(Court of Civil Appeals of Texas. San Antonio.   Feb. 11, 1920.)

1. EVIDENCE ⟨⊙⟩471(12) — STATEMENT AS TO IDENTITY NOT CONCLUSION OF WITNESS.

Testimony of one who was tarred and feathered by a group of citizens that a certain citizen "was the man that was presiding during the trial" was not objectionable as being a conclusion.

2. APPEAL AND ERROR ⟨⊙⟩1051(1)—ADMISSION OF CONCLUSION HARMLESS IN VIEW OF OTHER EVIDENCE.

It was harmless error to permit a witness to testify as to a conclusion, where the truth of the conclusion was established by testimony of other witnesses.

3. ASSAULT AND BATTERY ⟨⊙⟩27—EVIDENCE PROPERLY EXCLUDED AS IMMATERIAL.

In an action for damages by one tarred and feathered, where he testified that he refused to join the Red Cross because he had been advised that its agents and nurses would furnish aid to the German wounded soldiers as well as American soldiers, and that he gave this reason to the committee for declining to contribute, and that he thought German wounded soldiers should be left to die on the battle field, court did not err in striking out subsequent testimony to the effect that he thought that leaving wounded German soldiers on the field was a part of civilized warfare; the matter under inquiry being plaintiff's attitude toward the Red Cross, and not as to what his belief was concerning what was the practice in modern warfare.

4. ASSAULT AND BATTERY ⟨⊙⟩30—PLAINTIFF'S PRIOR CONDUCT, BROUGHT TO KNOWLEDGE OF DEFENDANTS, ADMISSIBLE TO EXPLAIN PROVOCATION.

In an action by one tarred and feathered by citizens because of his attitude towards the Red Cross, the court properly permitted great latitude in the introduction of evidence of prior acts and statements on the part of plaintiff, which would explain and cast light upon the act of provocation relied on, providing such prior acts and conduct were brought to the knowledge of the defendants; such facts affording an explanation of the motives and conduct of the defendants.

---

⟨⊙⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**5. TRIAL ☞46(2) — OFFER OF PROOF MUST SHOW RELEVANCY OF EVIDENCE.**

In an action for damages by one tarred and feathered on account of his attitude toward the Red Cross, refusal to permit testimony of certain prior acts of the plaintiff was not error, where offer of proof failed to show that the incident sought to be shown became known to the defendants prior to the time plaintiff was tarred and feathered.

**6. ASSAULT AND BATTERY ☞30—PRIOR PROVOCATIVE ACTS OF PLAINTIFF ADMISSIBLE.**

In an action for damages by one tarred and feathered on account of his attitude towards the Red Cross, testimony of witnesses that, prior to the act of provocation relied on, several persons had solicited plaintiff for the Red Cross, and that he refused to make a donation, and that he hardly looked up to see who they were was clearly admissible if knowledge by one or more of the defendants of the incidents was shown.

**7. ASSAULT AND BATTERY ☞30 — EVIDENCE AS TO PLAINTIFF'S VIEWS WITH RESPECT TO PREACHERS INADMISSIBLE.**

In such action, where witness testified that plaintiff said of a preacher, who led a crowd which whipped a man for not putting up a Red Cross sign, that "in place of being a preacher he was a damned hypocrite," court properly struck out the statement concerning the preacher, as it did not tend to show plaintiff's attitude toward the Red Cross.

**8. ASSAULT AND BATTERY ☞30 — EVIDENCE OF CONDUCT PRECEDING YEAR ADMISSIBLE TO SHOW PROVOCATION.**

In an action for damages by one tarred and feathered in May, 1918, on account of his attitude towards the Red Cross, evidence that plaintiff refused to join the Red Cross in December, 1917, was admissible as one of a series of acts tending to show that plaintiff was unpatriotic calculated to arouse anger.

**9. APPEAL AND ERROR ☞1058(1)—EXCLUSION OF EVIDENCE IN DEFENSE TO SHOW PROVOCATION IN ACTION FOR DAMAGES FOR ASSAULT HARMLESS IN VIEW OF OTHER EVIDENCE.**

In an action for damages by one tarred and feathered on account of his attitude toward the Red Cross, where plaintiff admitted that he told a committee, when it came to him, that he did not want to join, and that he did not join until after they talked to him vigorously, no harm could have resulted to defendants by refusal of the court to permit them to show that on such occasion plaintiff said he saw no use in putting a Red Cross sign in his window.

**10. APPEAL AND ERROR ☞544(1) — ASSIGNMENTS NOT SUPPORTED BY BILLS OF EXCEPTION OVERRULED.**

Assignments of error not supported by bills of exception will be overruled.

**11. EVIDENCE ☞471(2, 24)—TESTIMONY AS TO WHAT MADE PERSON MAD OPINION EVIDENCE.**

A witness may testify that people he talked to were mad, but when he undertakes to tell what made them mad he enters the realm of opinion evidence.

**12. APPEAL AND ERROR ☞1057(1) — EXCLUSION OF CONCLUSION OF WITNESS HARMLESS IN VIEW OF OTHER EVIDENCE.**

In an action for damages by one tarred and feathered on account of his attitude toward the Red Cross, exclusion of evidence of a witness that certain acts of the plaintiff made the people mad was harmless, where the impression that plaintiff's conduct made upon the citizenship in general was clearly shown in other testimony.

**13. DAMAGES ☞181 — WEALTH OF ONE OF SEVERAL TORT-FEASORS INADMISSIBLE IN EVIDENCE.**

When more than one tort-feasor is sued for ordinary damages and punitive damages, the wealth or financial standing of one person cannot be shown, for the purpose of augmenting damages against him, because the admission of such evidence necessarily has the effect of improperly augmenting the damages against the other defendants, whether rich or poor.

**14. TRIAL ☞83(1) — OBJECTION TO PROOF OF FINANCIAL CONDITION OF ONE TORT-FEASOR HELD SUFFICIENTLY SPECIFIC.**

In an action against several tort-feasors, an objection to evidence tending to show the financial standing of one of the defendants was sufficient to require the court to sustain the objection, for the reason that the financial standing of one defendant cannot be shown for the purpose of augmenting damages against all the defendants, although the testimony was not objected to on the specific ground that it tended to show the financial condition of one of the defendants and that he was a man of wealth.

**15. EVIDENCE ☞117—PREJUDICIAL EVIDENCE NOT TO BE ADMITTED ON MERE SPECULATION THAT IT MIGHT BECOME RELEVANT.**

A party should not be permitted to introduce prejudicial and irrelevant evidence upon a mere speculation that it might become relevant.

**16. APPEAL AND ERROR ☞1050(1)—GOOD INTENT DOES NOT RENDER HARMLESS PREJUDICIAL EVIDENCE.**

Good intent on the part of a person introducing prejudicial and irrelevant evidence does not render its admission harmless.

**17. ASSAULT AND BATTERY ☞24(3) — PROOF MUST FOLLOW ALLEGATIONS.**

In an action for damages by one tarred and feathered on account of his attitude towards the Red Cross, where plaintiff alleged that certain of the defendants had placed a placard on him, inscribed, "Traitor. All others take warning"—he should not have been permitted to testify that a certain other defendant had placed the placard on him in the absence of a trial amendment.

**18. ASSAULT AND BATTERY ☞35—CERTAIN DEFENDANT SHOWN TO HAVE PARTICIPATED IN TARRING AND FEATHERING PLAINTIFF.**

In an action for damages by one tarred and feathered on account of his attitude toward

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the Red Cross, evidence *held* to show that a certain defendant participated in the wrongful act.

19. ASSAULT AND BATTERY ⬤⟿35—EVIDENCE SUFFICIENT TO SHOW MENTAL DISTRESS.

Testimony of one who was tarred and feathered that it would worry a man a lot was sufficient to justify a finding that he suffered mental distress.

20. DAMAGES ⬤⟿185(1)—PHYSICAL PAIN MAY BE SHOWN BY CIRCUMSTANTIAL EVIDENCE.

Physical pain may be shown by circumstantial evidence, but the evidence must be such as to warrant a fair inference that physical pain was suffered, and not such as to warrant only a surmise whether or not such was the case.

21. ASSAULT AND BATTERY ⬤⟿35—NO PHYSICAL SUFFERING SHOWN BY ONE TARRED AND FEATHERED.

In an action for damages by one tarred and feathered, evidence *held* insufficient to warrant a finding that he suffered physical pain.

22. DAMAGES ⬤⟿216(4) — INSTRUCTION NOT SUPPORTED BY EVIDENCE; "PHYSICAL PAIN."

The words "physical pain" do no include mental distress, but mean bodily suffering, although a strong mental emotion may produce bodily injury and cause bodily suffering, so that an instruction allowing recovery for physical pain and also mental distress was error, where there was evidence of mental distress, but not of physical pain.

23. DAMAGES ⬤⟿176—PAST PROFITS BASIS FOR ESTIMATING LOSS OF PROFITS ONLY ADMISSIBLE IN EXCEPTIONAL CASES.

Profits in business depend on many contingencies, and past profits can only in exceptional cases be taken as a basis for estimating what profits would have been made, except for defendants' wrongful act.

24. ASSAULT AND BATTERY ⬤⟿35—NO SHOWING OF LOSS OF PROFITS TO BUSINESS OF ONE CHASED OUT OF THE LOCALITY.

In an action for damages by one tarred and feathered and chased from his place of business on account of his attitude toward the Red Cross, evidence *held* wholly insufficient to show that he would probably have made any profits out of his business if permitted to remain and conduct the same.

25. TRIAL ⬤⟿251(9)—INSTRUCTION AS TO DAMAGES FOR ASSAULT AND BANISHMENT TOO BROAD UNDER PLEADINGS.

In an action by one tarred and feathered and chased out of the county on account of his attitude towards the Red Cross, where the damage alleged was loss of profits caused by the inability of plaintiff to give his personal services to the carrying on of his business, a charge of the court, authorizing the jury to allow him the "loss sustained in his business as the direct result of his so being driven from his home and business," was erroneous, as authorizing recovery of losses not pleaded.

26. ASSAULT AND BATTERY ⬤⟿38 — PERSON TARRED AND FEATHERED ENTITLED TO RECOVER FOR FUTURE MENTAL DISTRESS, SHAME, AND HUMILIATION.

In an action by one tarred and feathered, placarded "Traitor," and chased out of the county, court properly authorized a recovery for mental distress, shame, and humiliation that plaintiff might suffer in the future.

27. ASSAULT AND BATTERY ⬤⟿39—PUNITIVE DAMAGES PROPERLY FOUND FOR ONE TARRED AND FEATHERED.

In an action by one tarred and feathered, placarded, and chased from the county on account of his attitude towards the Red Cross, evidence *held* sufficient to warrant the recovery of exemplary damages.

Appeal from District Court, Bexar County; R. B. Minor, Judge.

Suit by W. E. Kellar against G. C. Walker and others. Judgment for plaintiff, and defendants appeal. Reversed and remanded.

E. B. Coopwood, of Lockhart, W. O. Slater, of Luling, Zeb V. Nixon, of Wichita Falls, and Templeton, Brooks, Napier & Ogden, of San Antonio, for appellants.

John Sehorn, of San Antonio, for appellee.

MOURSUND, J. Appellee, Kellar, sued G. C. Walker and W. P. Walker, who reside in Bexar county, and C. T. Greenwood, W. B. Walker, R. Jacobs, T. T. Brown, S. H. Boggus, J. F. Boggus, J. J. Davis, B. R. Neill, J. W. Allen, and Wansley Wiley, of Caldwell county, to recover $250,000 actual and $250,000 exemplary damages, alleging in effect that they acted together, on or about May 17, 1918, in giving him a coat of tar and feathers, and placing a placard on him bearing the inscription: "Traitor. All others take warning"—after which they marched him around the town of Luling and compelled him to leave the county.

Defendant Allen was not served, and the case was dismissed as to him. The remaining Caldwell county defendants filed pleas of privilege, alleging that the Bexar county defendants had been sued for the fraudulent purpose of giving jurisdiction to the district court of Bexar county. The answer to the merits, of all the defendants, consisted of a general denial and a lengthy special answer, setting forth various acts and statements on the part of plaintiff with reference to the Red Cross, and the government and its soldiers, showing an attitude of opposition to the government with respect to the war, which acts and statements were alleged to have become generally known and to have created great indignation, and to have provoked such acts as were done to plaintiff on the occasion complained of by him.

The foregoing general statement will be supplanted with more extended statements of

---

⬤⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the pleadings, when necessary to the proper consideration of the assignments of error. The plea of privilege was overruled, and the trial resulted in a verdict and judgment for $25,000 actual and $25,000 exemplary damages against all defendants who answered. The court required a remittitur of $7,500 actual and $7,500 exemplary damages, which was filed, and judgment entered for $17,500 actual and $17,500 exemplary damages.

[1, 2] Complaint is made because the court refused to strike out the statement of plaintiff that defendant W. P. Walker "was the man that was presiding during the trial"; the objection having been made that it was a conclusion. This complaint is without merit. We see no error in permitting a witness to testify that a person presided over a meeting; but, if there was, no harm was done in this case, for the evidence clearly showed what W. P. Walker did, and one of the defendants testified without objection that said W. P. Walker was the presiding officer. Said Walker admitted he was asked to preside, and he agreed to do so, and stated he was left in charge of the meeting and put a second guard at the door. Surely this shows that he did preside. The first assignment is overruled.

[3] Plaintiff testified that the reason he at first refused to join the Red Cross was because he had been advised that its agents and nurses would furnish aid to the German wounded soldiers, as well as American soldiers, and that he gave this reason to the committee for declining to contribute to the Red Cross; that the committee told him the Red Cross would not take care of the Germans, and after being so informed he joined. The members of the committee stated he gave no such reason, and that they made no such statement. He was asked, after so testifying, if he thought it was right for the Red Cross to let the German wounded soldiers die on the battle field without rendering them assistance, to which he answered, "Yes, sir; absolutely." He was then asked if he thought that was a part of civilized warfare, and he answered, "Yes." Counsel then said, "You thought that was right?" He again answered, "Yes." Upon objection by his counsel the court struck out the last two questions and answers, on the ground that they were argumentative, immaterial, and irrelevant. We find no error in this ruling. The matter under inquiry was plaintiff's attitude towards the Red Cross, and his statement that he thought it right for the Red Cross to permit the German wounded to die was not stricken out. We are unable to see what relevancy his belief that such was the practice in modern warfare could have had to any issue in the case. To prove that he thought that kind of warfare was right could not have added anything to what he had stated. He had already stated practically the same thing, and also said he did not care to give to any institution that would pick up the enemy soldier and take care of him, when he should be left there. The second assignment is overruled.

[4] The defendants contended that such unlawful acts on their part as were shown were provoked by plaintiff's attitude towards the government, and towards the Red Cross during the war, and the court instructed the jury, in effect, that if they found that plaintiff had cursed and abused the Red Cross, or the Red Cross committees, or the government, or its soldiers, and that any of the defendants against whom they might render a verdict, at the time of the commission of the unlawful acts against plaintiff, knew or had been informed of such conduct on plaintiff's part, and if they believed from the evidence that such conduct and such knowledge or information thereof on the part of such defendants was calculated to arouse the passions of reasonable men, and did arouse the passions of such defendants, or either of them, and continued so to do up to the time of such unlawful acts, and that defendants, or either of them, were provoked to do what they did by reason of such conduct on his part, and their knowledge or information of the same, then they might consider such provocation in mitigation of damages, etc.

The last act on the part of plaintiff, relied upon, occurred on the day he was tarred and feathered. Upon being solicited by W. B. Walker and Jacobs to subscribe $2 to the Red Cross, an altercation resulted between Walker and plaintiff. Plaintiff admitted that he referred to the Red Cross card as a "damned thing," and there was much evidence to the effect that he used even stronger language, and also referred to the committees in abusive terms. The court permitted great latitude in the introduction of evidence of prior acts and statements on the part of plaintiff, evidently upon the theory, which we believe to be a correct one, that prior acts and conduct, which explain and cast light upon the act of provocation relied on, and which were brought to the knowledge of defendants, are admissible, because they afford an explanation of the motives and conduct of the defendants. See Sutherland on Damages, § 151. 2 R. C. L. p. 588, § 69.

The evidence along this line, which was introduced, covered all of plaintiff's acts and conduct pretty fully; but some testimony was excluded, and complaint is made of such exclusion. The defendants offered to prove by Mrs. Fisher that in the summer or fall of 1917 she, as a solicitor for the Red Cross, asked plaintiff for a donation, and that he declined to make a donation, stating that he had nothing to give to the Red Cross; that it took all he made to support his family. They also offered to prove by Mrs. Webb that

in December, 1917, she and other ladies, composing a committee, solicited plaintiff to join the Red Cross, stating they were trying to raise their number of members for the Christmas drive, and that he hardly looked up to see who they were, and kept on with his work, stating that he did not have any money for them and did not care to become a member of the Red Cross. They further offered to prove by M. H. Roamell that about six weeks before May 17, 1918, he. was in plaintiff's place of business, the day after a man had been whipped in Gonzales for not putting up a Red Cross sign, and that plaintiff talked about a preacher having led a crowd that did the whipping, and said that "in place of being a preacher he was a damned hypocrite."

[5-7] The bills of exception fail to show that, in connection with the offer to introduce this testimony, defendants stated that proof would be made that the incidents sought to be shown became known to defendants, or one of them, prior to the time plaintiff was tarred and feathered. In view of this, the bills of exception show no error in the ruling. The statements refer only to the bills of exception. We see no reason for excluding the testimony of Mrs. Fisher and Mrs. Webb, if knowledge by one or more of the defendants of the incidents is shown. The court did not err in striking out the statement of the witness Roamell, because it did not tend to show plaintiff's attitude towards the Red Cross, but to explain his views with respect to preachers. The witness Roamell testified to statements made by plaintiff concerning our government and soldiers, which were calculated to arouse the most intense resentment in all good citizens, and it is inconceivable .that defendants could have been injured by the exclusion of his statement concerning what plaintiff said about the preacher.

We conclude that the third, fourth, and fifth assignments should be overruled.

[8, 9] The defendants offered to prove by C. E. Lipscomb, John G. Townes, T. T. Brown, and R. Jacobs that they with others, as a committee, waited on plaintiff about Christmas, 1917, and he stated that he did not see any reason for a man having to put up a Red Cross sign, he did not see any use in that, or in joining the Red Cross, and he did not care to join, and after the committee had talked to him pretty roughly and vigorously, and told him they had to know where he stood, whether he was for the government or against it, he then agreed to join, and did join. The assignment relating to Lipscomb states that the additional fact was sought to be proven by him that as chairman for the Red Cross Membership Drive he had, previous to said time, called on plaintiff and asked him to join, and he had refused. The bill of exceptions relates only to the incident when

the committee called on plaintiff, and therefore only the admissibility of the testimony relating thereto need be considered. As the proof sought to be made disclosed the presence of some of the defendants, it appears that this testimony should have been admitted as explanatory of the motives and conduct of such defendants, in view of the final provocation which also grew out of plaintiff's attitude towards the Red Cross.

Appellee contends that an assault committed in May, 1918, could not have been provoked by passion aroused at something happening in December, 1917; and this is true, but the extent of the passion aroused by an act committed in 1918 may be accounted for by showing that such act was. the culmination of a series of acts, each tending to show that plaintiff was unpatriotic, which acts, occurring at a time when all good citizens were co-operating in all things calculated to assist in winning the war, were calculated to arouse anger and resentment on the part of such citizens. The contention is made, however, that appellee testified to the same facts. After testifying that he had been asked by Mr. Townes if he did not want to join the Red Cross, and he said, "No," he testified further as follows:

"It is a fact that after they had been to me, and after these ladies had been to me about joining, and I had refused to join, a committee consisting of several men, including C. E. Lipscomb, John G. Townes, G. C. Walker, Mr. Jacobs, and Mr. Brown and others, just before Christmas, 1917, or about that time, in reference to this same proposition of joining the Red Cross, waited on me at my store. As to these persons wanting me to join and put a Red Cross sign in my window, they hadn't said anything about what to do; they just wanted to know if I wanted to join. I didn't tell them, when they first came in, that I didn't want to join, and that I didn't see any use of putting any such sign in my window. I don't know as I showed in my discussion with them that I was rather mad, when they first commenced to talk to me about it; but I had some controversy there with that committee there at the beginning. They told me that they had to know where I stood; that I was either for the government or against it, and after they talked to me pretty vigorously there, I then consented to join, and did join, and paid a dollar; that is a fact. But I did not do this until after this committee had waited on me."

It will be noticed that the only difference between his statement and the proposed testimony is that he denied that he told them, when they first came in, that he did not want to join, and did not see any use in putting any such sign in the window. He admits they had a controversy, and that he had refused before this to join. Further on in his testimony he stated that when they came he gave certain reasons for not joining. The jury must have understood that he at first re-

fused to join, and that he did not want to join. The proposed testimony would therefore have added nothing, except that he said he did not see any use in putting a Red Cross sign in the window. In view of what he admitted did occur, and of the volume of testimony showing his general attitude towards the Red Cross, it is inconceivable that harm could have resulted to defendants because of the refusal of the court to permit them to show that plaintiff said he did not see any use in putting the Red Cross sign in the window.

Assignments 6, 7, 8, and 9 are overruled.

The tenth assignment complains of the failure to admit the testimony of George Welch with respect to statements made about a month before May 17, 1918. The bill of exceptions does not disclose that these statements were communicated to any of the defendants, nor that the court was informed that such proof would be made. The assignment must therefore be overruled. We are unable to understand why this testimony was excluded, and that of Roamell, Johnson, and George Boggus, which was practically to the same effect, was admitted, unless it was excluded because of no offer to show that knowledge thereof was communicated to some of the defendants.

[10] The eleventh and twelfth assignments are not supported by bills of exceptions. The bill of exceptions referred to under the eleventh relates to a different matter, and we find none which presents the ruling complained of. The assignments are overruled.

[11, 12] The thirteenth assignment is without merit. W. B. Walker, after testifying that he told the people what occurred on the morning of May 17, 1918, when he and Jacobs went as a committee to solicit a subscription from plaintiff, was asked what effect that had upon the minds of the people, and answered that it made them all mad. The court excluded the statement that it made them all mad, upon the objection that it was a conclusion and opinion. Appellee concedes the witness could have testified that the people he talked to were mad, but when he undertook to tell what made them mad he entered the realm of opinion evidence. We do not believe the court erred in sustaining the objection. At any rate, the impression that plaintiff's conduct made upon the citizenship in general was clearly shown in Brown's testimony and that of others, so there could have been no harm by reason of the ruling.

[13-16] The court permitted plaintiff to prove by defendant Brown that he owned about 2,000 acres of land individually and in partnership. The rule appears to be well established that, when more than one tort-feasor is sued for damages, the wealth or financial standing of one defendant cannot be shown for the purpose of augmenting damages against him, because the admission of such evidence necessarily has the effect of improperly augmenting the damages against the other defendants whether rich or poor. Washington Gaslight Co. v. Lansden, 172 U. S. 534, 19 Sup. Ct. 296, 43 L. Ed. 543; Schafer v. Ostmann, 148 Mo. App. 644, 129 S. W. 63, and cases cited therein. Appellee does not contend that the rule is erroneous, but relies upon other grounds for answer to the assignment of error. This testimony was objected to, but not on the specific ground that it tended to show Brown's financial condition and that he was a man of wealth. This in our opinion was wholly unnecessary. Counsel for defendants, if they believed that the wealth of one defendant could not be relevant in a suit against several, would hardly want to apprise the jury of the fact that the inquiry, if permitted, would develop the fact that one was wealthy. If a man is asked how much property he has, the obvious purpose is to let the jury know his financial resources.

Appellee seeks to justify the admission of the testimony on the ground that his purpose was to show ill will on the part of Brown towards plaintiff. He followed up the inquiries concerning the extent of Brown's ownership of land by proving that most of the land was cultivated by tenants. Then he asked if it was not a fact that a day or two before May 17, 1918, he remarked that Kellar ought to be investigated because of remarks he made about the land tenure down there. Brown answered that he did not. It occurs to us that, if the purpose of the inquiry was to establish ill will on the part of Brown, other than that growing out of his resentment of plaintiff's attitude with respect to the war, the inquiry should have been directed to that point, and, if he denied it, some proof adduced contradicting him. The bill of exceptions does not show that the testimony was offered for the purpose mentioned by appellee; but, if such purpose was stated, the court should have required that the inquiry be directed to the point whether there was ill will on that ground, and, if there was a denial, Brown could have been asked whether he had made statements showing such ill will. Appellee contends vigorously that, if Brown had admitted the ill will or statements indicating it, evidence that he cultivated considerable land through tenants would show greater likelihood of his resenting interference or criticism than if he had only one tenant. The court was never confronted with the question whether the evidence was admissible as bearing upon the extent of ill will on the ground inquired about; for the evidence wholly failed to raise an issue of the existence of such ill will. Under appellee's theory, the testimony, although prejudicial and irrelevant, could be introduced upon the mere speculation that it might become relevant.

It is further contended by appellee that as no inquiry was made as to the value of the land, or whether it was incumbered or not,

It is evident that it was not intended to prove Brown's wealth. The intent is not material, since the obvious effect is to place before the jury the knowledge that Brown is the owner of 2,000 acres of land, most of which is being cultivated. Appellee says neither the court nor the jury could judicially know the value of the land. That is true, out the testimony of Brown discloses that 1,200 acres of the land was situated close to Luling, in Caldwell county, and the remainder in Guadalupe and Gonzales counties, "some on the river." These counties lie close to the county in which the jury resides, and it would be indeed strange if out of twelve men not one would have a fair idea of the value of lands thus situated. The assignment is sustained.

[17] Plaintiff testified that G. C. Walker placed the placard on him, inscribed: "Traitor. All others take warning." Defendants moved to strike out such testimony, because there was no pleading to support it, and because, on the contrary, the petition charged that this was done by four other persons, under the direction of T. T. Brown. The testimony should have been excluded, unless a trial amendment was filed, for the allegation that certain of the defendants placed the placard on plaintiff negatives the idea that the others did so. The fifteenth assignment is sustained.

Complaint is made that the court, over defendants' objection, permitted G. C. Walker to be asked if he did not go to the meeting for the purpose of lending his countenance to it, and requiring him to answer. No bill of exceptions is referred to showing that such question was objected to and exception reserved, nor do we find any. Bill of exceptions No. 16 relates to a different question. The statement of facts discloses that the question whether he went for the purpose of lending his countenance was not answered, and was followed up by other questions. The assignment, in the absence of a proper bill of exceptions, must be overruled.

[18] The court instructed a verdict against W. P. Walker, C. T. Greenwood, T. T. Brown, S. H. Boggus, J. T. Boggus, J. J. Davis, B. R. Neill, and Wansley Wiley, and such action is complained of, and by separate assignment complaint is made, especially, as to such instruction in so far as it included W. P. Walker. By other assignments it is contended that such instruction as to W. P. Walker was injurious to all the Caldwell county defendants, because it resulted in overruling their plea of privilege and deprived them of the right to have the jury pass upon an issue of fact raised by their plea of privilege. While the issue is formally raised whether the court was correct in instructing a verdict as to any of the defendants, appellants confine themselves in statement and argument to the issue whether the court erred in holding W. P. Walker liable as a matter of law. The testimony is in substance as follows:

That he was not at his farm near Luling very much, and had not heard what plaintiff had been saying. Defendant Brown learned that Walker was at his place, and sent a boy for him on May 17, 1918. In the meantime a meeting of citizens called by Brown had discussed plaintiff's acts, and a committee consisting of Brown and others was preparing to go after plaintiff. As Walker entered the clubroom, Brown had just started to leave. Walker had made inquiries on the street, and been informed that "they were going to try Kellar." Brown told him the citizens had threshed out plaintiff's case thoroughly, and had pronounced him an undesirable citizen and a traitor. He told Walker he was going after plaintiff. He also said to Walker:

"I want you to hold these people down there. I don't want any harm done any one. I want you to preside over the meeting, and I want you to tell Mr. Kellar we will give him just so many hours to wind up his business and leave here."

Walker agreed to this request. The room and hallway were full of people, who were excited and angry, and threats of hanging plaintiff were uttered. Walker cautioned the people, stating he was not going to see any bodily harm done, and that as long as he was in charge of the meeting they could not do anything. There were remarks made about tar and feathers being too good for plaintiff, but Walker did not learn that plaintiff was to be tarred and feathered until after Brown and the others brought plaintiff into the room. Walker testified further that Brown had left him in charge, and so, after Brown came back with Kellar, he (Walker) put a second guard at the door to keep out the crowd, and did not let anybody in. He then delivered the message to Kellar that Brown told him to deliver, and declined to hear Kellar, because he was afraid it would bring on discussion and intensify the feeling and perhaps bring about a killing. He did not believe the crowd would tolerate an argument. At this juncture Brown told plaintiff to step out on the wagon sheet, and directed his committee to go ahead and do their duty. Walker gave no orders to the committee, and had nothing to do with appointing them; but, when one of the committee started to put tar on plaintiff's flesh, Walker told him not to put it on the flesh— that it was coal tar and would pull the skin off. He gave no orders about marching Kellar out on the street, or anything of that kind.

Plaintiff testified that, after he was told to march out, W. P. Walker said, "Make him carry the flag;" but that G. C. Walker objected, stating, "No; you don't let no traitor carry the United States flag," and took the flag himself. While not specifically denied, Walker's statement that he gave no orders or directions must be considered a denial of that testimony. Plaintiff also testified that

all the defendants marched along, while he was made to parade the streets after leaving the clubroom. Walker did not deny being in the procession. Brown testified that Walker might have been in it, but had nothing to do with it. The foregoing shows W. P. Walker's connection with the transaction, as detailed by him. It seems to us that it conclusively shows that he agreed to participate in the dealings of the committee and citizens with plaintiff. He knew before he delivered the message that plaintiff was to be tarred and feathered, and he did not withdraw and decline to have anything to do with the matter. Certainly the persons who informed him of the contemplated punishment must have understood by his actions that he agreed to the proceedings. He took charge of the meeting, and did not withdraw therefrom until plaintiff was marched out. We are unable to see any merit in the contention that there was an issue of fact as to his participation in the unlawful acts charged against defendants.

The contention is made that the court should have instructed a verdict in favor of W. B. Walker. W. B. Walker was the committeeman who had the altercation with plaintiff on May 17, 1918, growing out of the request that plaintiff pay $2 for the Red Cross. He knew, about 20 minutes before the meeting took place, that there would be such a meeting and he attended it. At the meeting Mr. Jacobs, who had accompanied W. B. Walker on the visit to plaintiff, was asked to make a statement with reference to what had taken place that day, and then W. B. Walker said he confirmed what Jacobs had said. After plaintiff's acts had been discussed, Brown, who took the leading part in the proceedings, said:

"If there is anybody in here that objects to tarring and feathering him and giving him so long to leave town, you are at liberty to say so and not take part in it."

Nobody objected, and he then appointed a committee to go with him after plaintiff, and also appointed a committee to apply the tar and feathers. W. B. Walker remained in the room throughout the proceedings which have been detailed in discussing the assignments relating to W. P. Walker. W. B. Walker had nothing to do with the selection or appointment of committees, and did not assist in applying the tar and feathers, or attaching the placard, and did not touch plaintiff. The plaintiff, after testifying to the statement W. P. Walker made to him, and that said W. P. Walker then told Brown to take charge of plaintiff, testified further as follows:

"Mr. Brown appointed a committee, consisting of Mr. B. R. Neill and J. W. Allen, and he called W. B. Walker, which is Byron Walker as I know him; he objected—said, 'J. P. will take my place;' that was Uncle Johnnie Walker would take his place; and Mr. Wiley, Wansley Wiley."

W. B. Walker was asked while on the witness stand whether he agreed to the sentence pronounced by W. P. Walker, and he said he did. Further on, when questioned as to his attitude, he said:

"Well, I am saying right now in my mind it was agreeable to me."

As to the issue with respect to W. B. Walker is whether there was evidence from which a jury could find against him, the evidence as to him must be considered from the standpoint most favorable to plaintiff. When the evidence thus stated is considered, it is sufficient to justify a finding that he not only agreed to and approved what was done, but suggested the name of a person to do part of the work of tarring and feathering plaintiff. Surely that one statement, if made by him, would warrant an inference that by his words he encouraged the commission of the acts complained of. The twenty-fifth and twenty-sixth assignments are overruled.

The twenty-eighth assignment reads as follows:

"The court erred in instructing the jury to find against the defendant G. C. Walker, if they believed from the evidence that he advised or agreed to the assault on plaintiff, because there is no evidence to justify finding that he had advised or agreed to said acts; the undisputed evidence showing that he was merely present, and that he said or did nothing, except the evidence of plaintiff to the effect that the said Walker placed the placard on him bearing the inscription: 'Traitor. All others take warning'—and the issues of fact as to said G. C. Walker should have been confined to the one controverted issue as to whether or not he did place said placard on him, and in overruling said defendants' objection to said charge on said ground."

The testimony of Brown is to the effect that before the meeting occurred he discussed with G. C. Walker plaintiff's acts, and stated he was going to call a meeting, and that nothing short of a coat of tar and feathers would satisfy him, and he hoped it would satisfy the balance. He told G. C. Walker that he did not want him to have anything to do with it, or take any part in the meeting, or the tarring and feathering. This was done because G. C. Walker had a son who had been wounded in France, and Brown was afraid that G. C. Walker would not remain cool-headed. G. C. Walker attended the meeting in spite of such request. There is no evidence that he did anything, except the testimony of plaintiff that said Walker placed the placard on him, which was contradicted by other witnesses. Brown testified that, when he discussed the matter with G. C. Walker, the latter said that what Brown had suggested ought to be done. He also testified that said G. C. Walker was present in the room when he made the statement that he was going to have plaintiff tarred and feathered,

and those who did not agree could leave the room, and that Walker did not leave the room. Again, Brown stated that the sum and substance of his statement was:

"Now, all those who want to participate, remain; and those who do not, leave."

G. C. Walker testified he agreed to what was done. He knew of the purchase of the tar and feathers, knew the purpose of the meeting, and had a pretty good idea of what was going to be done, unless they changed Mr. Brown's idea. He said, "I was willing to back Brown up in it; everything he did." When his brother, W. P. Walker, made the statement to plaintiff, it met with his approval. Plaintiff testified that, just as they were going to leave the room, W. P. Walker suggested that plaintiff be made to carry the flag, and, when one of the men started to hand it to him, G. C. Walker said, "No; you don't let no traitor carry the United States flag," and took the flag himself; that they then marched on down the street. We think it is obvious that the foregoing evidence, if found true by the jury, would support a finding that G. C. Walker participated in the acts complained of in such a manner as to make him liable therefor, regardless of whether or not he placed the placard on plaintiff. The twenty-eighth assignment is overruled.

Plaintiff alleged that by reason of the force used by defendants in compelling him to leave his place of business and in applying the tar and feathers and being compelled to walk along the streets, he was wounded and bruised about his person, and as a direct result thereof he suffered great physical pain, and was put in great terror lest he be killed, and by reason thereof suffered great mental distress.

[19-22] The court authorized the jury, in estimating actual damages, to take into consideration the physical pain suffered by plaintiff, and also the mental distress, shame, and humiliation. This part of the charge was objected to on the ground that there was no evidence of physical injury or physical pain. Plaintiff testified as follows:

"When this committee, consisting of Brown and Boggus and others, came to my place of business and forced me to go to the city clubroom, they were not in any ways particular how they handled me. When they first came to my place after they said take hold of me, you know why, they just reached out and taken hold of my arm; carried me in a car, you know. Up in the city club there wasn't any handling of me, much more than just applying that stuff. They forced me to go down stairs, they taken hold of me and they told me to march on, and I went because I was afraid to do anything else."

In answer to an inquiry concerning the effect these acts had upon him mentally, he answered, "Why it will worry a man a lot." The evidence shows that the tar was applied to his clothing, and not to his flesh. He pleaded that he offered no resistance, and there is no evidence of a struggle, or that he was jerked, or his arms squeezed, unless it follows as a legitimate inference from his testimony above copied. His conclusion that they were not in "any ways particular" how they handled him is followed by a statement of what they did, and it cannot be inferred that such statement was intended to express the idea that sufficient force was applied to cause bodily suffering, rather than the idea that he was subjected to the indignity of being treated like a prisoner. There is no evidence that he was wounded or bruised, as alleged by him, and it cannot be presumed that he was perhaps injured in a different manner than that alleged by him. The presumption would be to the contrary. He did not testify that he suffered physical pain, and in fact he was not asked whether he did. He was asked concerning the effect upon his mind, and answered that it would worry a man a lot. This answer was sufficient to justify a finding that he suffered mental distress, but not that the effect on his mind was so severe as to bring about bodily suffering.

A strong mental emotion may produce bodily injury and cause bodily suffering. Fright may cause severe nervous disorders, such as entail bodily suffering. Of course, physical pain may be shown by circumstantial evidence, but the circumstances must be such as to warrant a fair inference that physical pain was suffered, and not such as to warrant only a surmise whether or not such was the case. Appellee quotes a definition of the word "pain," taken from Webster's dictionary, but overlooks the restrictive effect of the word "physical," descriptive of the kind of pain meant by the court. Surely, when a court instructs the jury that it may allow for physical pain, and also mental distress, shame, and humiliation, the jury is bound to understand, by the words "physical pain," that the court is of the opinion that there was evidence of bodily suffering. We are not willing to approve a definition of the words "physical pain," such as would make them mean the same thing as mental distress, and thus attempt to destroy a distinction well established by courts and text-writers. We conclude that the appellants' contention is correct, and therefore sustain the twenty-ninth assignment of error.

The thirtieth assignment reads as follows:

"The court erred in its main charge in authorizing the jury, in assessing damages, to take into consideration the 'loss, if any, he has sustained in his business as a direct result of the assault and being driven from home,' because the only damage claimed by plaintiff to his business in his pleading is the sum of $2,500, which he alleges that he would have made, had he been permitted to remain at Luling and conduct his business as usual, and there is no evidence in this case showing what amount of money he would have made, had he been permitted to remain in Luling, and no evidence to

justify the submission of any issue with reference to the loss of business, and there is no testimony to show whether his business after the 17th day of May, 1918, was run at a loss or a profit, or to show what sum of money, if any, he would have made, if he had been permitted to remain at Luling and conduct his business, that the said portion of the charge does not confine the jury to the facts pleaded, but authorizes them to consider sums other than the money he would have made had he been permitted to remain in his business, and there is no pleading to justify the consideration of any such items, and in overruling defendants' objections to said charge on said ground."

The thirty-ninth assignment complains of the same portion of the charge; the objections therein presented being that the evidence with reference to plaintiff's business was not of such a character that the jury could determine therefrom what loss was sustained by plaintiff, if any, by reason of being driven from his home and business. The portion of the charge objected to and the objections urged are disclosed in the above-copied assignment of error.

[23] The loss pleaded is not that caused by a cessation of business on account of the tort of another, but that caused by the inability of plaintiff to give his personal services to the carrying on of the business, which was that of the sale and repair of saddles and harness and the repair of shoes. The business was conducted on premises owned by him. He had accumulated some property, and estimated that during the last year and a half previous to May 17, 1918, he had made profits, which represented an average profit of $150 per month. He did not show how much of this profit was attributable to the capital invested and how much to his personal services. On May 17, 1918, he had only two men in his employ, Mr. Moses and a young man named Boggus. Plaintiff's testimony discloses that during part of the time that he carried on his business he had as many as six or seven men employed. The natural inference is that his business had already diminished prior to his enforced absence. During his absence, Moses and Boggus were the only employés, until in January, 1919, when Mr. Beaumont was sent by plaintiff to assist in conducting the business. He made no effort to show that the profits during the year and a half preceding his departure would constitute a fair basis, by reason of similarity of conditions, for estimating what should have been made in the next eight months. In fact, his own testimony raises a very strong inference that there had been a great falling off in the volume of business before he was required to absent himself. The evidence was of such a character that the jury could only conjecture that a profit would have been made, and could only indulge in conjecture whether plaintiff's absence had any effect upon the situation. It does not appear that he even lost money by having to

employ some one in his place at higher pay than he made in his new location. Plaintiff failed to show with reasonable certainty that he would have made any profit, had he been permitted to remain and conduct his business. It is universally recognized that profits in business depend on many contingencies, and that past profits can only in exceptional cases be taken as a basis for estimating what profits would have been made, except for a tortious act. War and drouths affect business, and in a small business the popularity of the owner may be an important factor. The record discloses that there had been some dissatisfaction with plaintiff's attitude towards his government and the Red Cross, and that the altercation on May 17, 1918, brought about very general indignation and resentment. There can be no doubt that a general uprising of the citizens against him such as is shown by the evidence, must have had as a foundation a firmly established belief that he was an undesirable citizen. An element of uncertainty as to future profits, and a condition entirely variant from that existing when he made profits, was therefore shown to exist prior to the commission of the acts complained of.

[24] The evidence being wholly insufficient to show that he would probably have made a profit, if permitted to remain and conduct his business, it is unnecessary to consider the evidence relied on to show that no profit was in fact made. We will, however, discuss it. Plaintiff testified that in January, 1918, he estimated his stock of goods, machinery, and tools at $3,500, but took no inventory. He failed to state how much he bought and sold between that time and May 17, 1918. He testified he replenished the stock to the extent of $1,603.14 worth of goods, after he left Luling. He had Moses ship to him part of the stock, which he estimated at $500, but would not swear that it was not worth as much as $1,000. The fact that he was simply guessing is shown by his testimony given before he investigated and ascertained that he sent $1,603.14 worth of goods to his employés, in which he stated in effect that he figured the goods he sent were an offset to all they shipped him. This was stated in explanation of his failure to mention the goods shipped him when he first testified. He further testified he drew money out of the bank, which had been deposited by Moses, and he estimated the sum at $500, but admitted he did not know whether it was more than that. He testified that he finally sold the stock for $1,500, and gave the buyers about $300 worth of property, and retained one machine for which he might have got a couple of hundred dollars, but which was about worn out. He did not testify how much he estimated this machine at in January, 1918. He did not testify that he sold the stock at list price, and in fact, as we understand his testimony, he stated he sold below list price.

So careless was he concerning making proof such as would warrant more than a guess, that he made no list of the goods shipped to him, although at that time he had already decided to bring a suit. He summed up by taking the figures most favorable to him and ignoring the goods he gave away, the discrepancy between list price and selling price, and the machine retained by him, and stated that he estimated from such figures that he lost $2,600, instead of making a profit. As a matter of fact the jury would have to guess how much his stock was worth in May, 1918, and also guess how much he got for it. The loss he guesses at is not consistent with other testimony given by him. For instance, if his stock, machinery, and tools had been worth $3,500 on May 17, 1918, as he at first implied, but later said his estimate was made in January, and he added $1,603 worth, and sold $1,500 worth below list price, gave away $300 worth, retained a machine worth $200, and withdrew stock worth from $500 to $1,000, then his employés sold stock worth from $2,103 to $2,603. Moses managed the business for eight months for 7½ per cent. of the receipts, and it can hardly be presumed that his subordinate received more pay. If the stock had been sold at cost, and the employés received 15 per cent., they would have received less than $400 for their eight months' services—less than $25 each per month; but, if they sold it at cost, the plaintiff would only be out the $400 and such other expenses as were necessarily incurred. He makes no attack upon the honesty of his employés, and admits they sent him reports saying they did a good business. He admits they probably deposited more money than he did prior to May 17, 1918, but explains this by saying Moses sold some wood for him, out of which, however, no commission was paid Moses. He kept no books and failed to produce any kept by Moses, or any bank statements, but simply undertook to guess at everything.

[25] Although he only sought to recover for loss of profits, and did not allege that his stock or machinery had become less valuable because of his absence, the charge of the court authorized the jury to allow him "the loss sustained in his business as the direct result of his being so driven from his home and business." Under this charge the jury must have felt authorized to allow him any 'loss they found he sustained, whether of stock of goods accumulated prior to May 17, 1918, or profits they might find he would have made. The charge was erroneous, because it authorized the recovery of losses not pleaded, and also because the evidence did not show that any profits would have been made, had plaintiff been permitted to remain at Luling. Sometimes it is of interest to see what the views of other courts have been in considering what degree of certainty should be attained in making proof of profits alleged to have been lost. We will cite a few cases which we believe to be of some assistance in the consideration of the facts of this case. Miller v. Wilkes-Barre Gas Co., 206 Pa. 254, 55 Atl. 974; Bierbach v. Goodyear Rubber Co., 54 Wis. 208, 11 N. W. 514, 41 Am. Rep. 19; De Palma v. Weinman, 15 N. M. 68, 103 Pac. 782, 24 L. R. A. (N. S.) 423; McGill v. Fuller Co., 45 Wash. 615, 88 Pac. 1038. The assignments are sustained.

[26] By assignment 31 complaint is made because the court authorized a recovery for mental distress, shame, and humiliation plaintiff may suffer in the future. We find no merit in the objections urged, and overrule the assignment.

[27] Assignments 32 to 38, inclusive, relate to exemplary damages—the contentions being that the evidence did not justify the submission of such issue as to any of the defendants; that it was erroneously submitted; that as to defendants Jacobs and W. P. and W. B. Walker, the evidence was insufficient to warrant the recovery of exemplary damages. We do not believe any of the contentions are sound, and overrule all of such assignments.

Assignments 40 to 55, inclusive, and 59 and 60, relate to the verdict and judgment; the contention being presented in various ways that the judgment rendered after filing of the remittitur is excessive, both as to actual and exemplary damages, as to all defendants, and as to several in particular. In view of the fact that the judgment will be reversed and the cause remanded for another trial, on account of errors hereinbefore pointed out, we will not pass upon these assignments; it being obvious that the evidence may differ, and that any indication of our view upon the facts as presented would be of no benefit upon another trial.

The fifty-sixth assignment complains of a remark made by counsel in argument, which upon objection was withdrawn, and an instruction given not to consider it. The argument was clearly improper. As it will not occur upon another trial, and the cause is to be remanded upon other grounds; we need not consider it further.

We find no merit in the fifty-seventh and fifty-eighth assignments.

The judgment is reversed, and the cause remanded.